# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

UNITED STATES *ex rel.* KURT KROENING

STATE OF ARKANSAS *ex rel.* KURT KROENING

STATE OF CALIFORNIA *ex rel.* KURT KROENING

STATE OF COLORADO *ex rel.* KURT KROENING

STATE OF CONNECTICUT *ex rel.* KURT KROENING

STATE OF DELAWARE *ex rel.* KURT KROENING

DISTRICT OF COLUMBIA *ex rel.* KURT KROENING

STATE OF FLORIDA *ex rel.* KURT KROENING

STATE OF GEORGIA *ex rel.* KURT KROENING

STATE OF HAWAII *ex rel.* KURT KROENING

STATE OF ILLINOIS *ex rel.* KURT KROENING

STATE OF INDIANA *ex rel.* KURT KROENING

STATE OF IOWA *ex rel.* KURT KROENING

STATE OF LOUISIANA *ex rel.* KURT KROENING

STATE OF MAINE *ex rel.* KURT KROENING

COMMONWEALTH OF MASSACHUSETTS *ex rel.* KURT KROENING

STATE OF MICHIGAN *ex rel.* KURT KROENING

STATE OF MINNESOTA *ex rel.* KURT KROENING

STATE OF MONTANA *ex rel.* KURT KROENING

STATE OF NEVADA *ex rel.* KURT KROENING

Civil Action File No. 12-CV-00366

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER 31 U.S.C. § 3730 FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS**

Jury Trial Demanded

i

STATE OF NEW JERSEY *ex rel.* KURT KROENING

STATE OF NEW MEXICO *ex rel.* KURT KROENING

STATE OF NEW YORK *ex rel.* KURT KROENING

STATE OF NORTH CAROLINA *ex rel.* KURT KROENING

STATE OF OKLAHOMA *ex rel.* KURT KROENING

STATE OF RHODE ISLAND *ex rel.* KURT KROENING

STATE OF TENNESSEE *ex rel.* KURT KROENING

STATE OF TEXAS *ex rel.* KURT KROENING

COMMONWEALTH OF VIRGINIA *ex rel.*
KURT KROENING

STATE OF WISCONSIN *ex rel.* KURT KROENING

　　　　　　Plaintiffs/Relator,

v.

FOREST PHARMACEUTICALS, INC.,

FOREST LABORATORIES, INC.

　　　　　　Defendants

## TABLE OF CONTENTS

Page

I.  INTRODUCTION.................................................................................................................1

II.  SUMMARY OF DEFENDANTS' CONDUCT ................................................................2

III.  JURISDICTION AND VENUE........................................................................................2

IV.  PARTIES............................................................................................................................3

V.  STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO Defendants' FALSE CLAIMS ACT VIOLATIONS................................................................................3

　　A.  Federal Government Healthcare Programs ............................................................3

　　　　1. Medicare ........................................................................................................4

　　　　2. Medicaid ........................................................................................................4

ii

B. The False Claims Act and the Medicare Fraud & Abuse Anti-Kickback Statute ............................4

1. False Claims Act .................................................................................................4

2. Medicare Fraud & Abuse Anti-Kickback Statute ..............................................5

C. FPI and FLI's violations ..............................................................................................7

VI. FACTUAL BACKGROUND .......................................................................................................9

A. Defendants' Sales and Marketing Training and Directives to Sales Force .................9

B. Defendants' Knowing Violation of Federal and State Anti-Kickback Statutes ...........11

VII. COUNTS ....................................................................................................................................21

COUNT ONE False Claims Act U.S.C. § 3729(a)(1)(A) ........................................................21

COUNT TWO Federal False Claims Act U.S.C. § 3729(a)(1)(B) ..........................................21

COUNT THREE Federal False Claims Act U.S.C. § 3729(a)(1)(C) .......................................22

COUNT FOUR Arkansas Medicaid Fraud False Claims Act Ark. Code Ann. § 20-77-901 ............22

COUNT FIVE California False Claims Act., Cal. Gov't Code§ 12651 et seq. .......................23

COUNT SIX Colorado Medicaid False Claims Act., Colo. Rev. Stat. § 25.5-4-303.5 et seq.............24

COUNT SEVEN Connecticut False Claims Act., Coim. Gen. Stat.§§ 17b-30la et seq. ..................25

COUNT EIGHT Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 et seq. .................25

COUNT NINE District of Columbia False Claims Act, D.C. Code § 2-308.14 et seq. ..................26

COUNT TEN Florida False Claims Act, Fla. Stat. Ann.§ 68.081 et seq. ................................27

COUNT ELEVEN Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 et seq. .............28

COUNT TWELVE Hawaii False Claims Act, Haw. Rev. Stat.§ 661-22 et seq. ......................28

COUNT THIRTEEN Illinois False Claims Act, 740 III. Comp. Stat. 175/1 et seq. ..................29

COUNT FOURTEEN Indiana False Claims and WhistleblowerProtection Act,Indiana Code § 5-11-5.5 ..........30

COUNT FIFTEEN Iowa Medicaid False Claims Act, Iowa Code § 685.1 et seq.....................31

COUNT SIXTEEN Louisiana Medical Assistance Programs Integrity Law, LaRev. Stat. Ann.§ 46:439.1 et seq.................................................................................................................................31

COUNT SEVENTEEN Maine False Claims Act, Me. Rev. Stats. Ann. tit. 5 § 215 et seq ................32

COUNT EIGHTTEEN Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, §5(A)-(O) ........33

COUNT NINETEEN Michigan Medicaid False Claims Act, MCLA § 400.601 et seq....................34

COUNT TWENTY Minnesota False Claims Act, Minn. Stat. § 15c.01et seq....................................34

COUNT TWENTY-ONE Montana False Claims Act; Mont. Code Ann. §17-8-401 et seq.................35

COUNT TWENTY-TWO Nevada False Claims Act, Nev. Rev. Stat. §357.010 et seq. .....................36

COUNT TWENTY-THREE New Jersey False Claims Act; N.J. Stat.§ 2A:32C-l et seq. ..................37

COUNT TWENTY-FOUR New Mexico Medicaid False Claims Act, N.M. Stat. Ann.,1978, § 27-14-1 et seq.....................................................................................................................................................37

COUNT TWENT-FIVE New York False Claims Act, N.Y. State Fin. Law§ 187 et seq. ..................38

COUNT TWENTY-SIX North Caro1ina False Claims Act, N.C.Gen. Stat. § 1-605 et seq..............39

iii

COUNT TWENTY-SEVEN Oklahoma Medicaid False Claims Act; 63 Okl. St. § 5053 et seq. .........................40

COUNT TWENTY-EIGHT Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 et seq. .........................40

COUNT TWENTY-NINE Tennessee Medicaid False Claims Act, Tenn. Code Ann.§ 71-5-181 et seq. ............41

COUNT THIRTY Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann.        § 36.001 et seq. ...................................................................................................................................42

COUNT THIRTY-ONE Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 et seq. ...............43

COUNT THIRTY-TWO Wisconsin False Claims Act; Wis. Stat: § 20.931 et seq. ............................................43

VIII.     PRAYER FOR RELIEF .........................................................................................................................44

iv

# INTRODUCTION

NOW COMES Kurt Kroening, Plaintiff/Relator, through his attorneys, Cross Law Firm, S.C., by Mary Flanner and Nola J. Hitchcock Cross, and states that this is an action brought on behalf of THE UNITED STATES OF AMERICA by KURT KROENING ("Relator") against FOREST LABORATORIES, INC. ("FLI") and FOREST PHARMACEUTICALS, INC. ("FPI"), (collectively referred to as "Defendants") pursuant to the federal civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and on behalf of the above named states under the following statutes: Arkansas, Ark. Code Ann. § 20-77-901 *et seq.*; California, Cal. Gov't. Code §12650 *et seq.;* Colorado, Colo. Rev. Stat. § 25.5-4-304 *et seq*.; Connecticut, Conn. Gen. Stat. §176-301a *et seq.;* Delaware, Del. Code Ann. Title 6 § 1201 *et seq.*; District of Columbia, D.C. Code Ann. § 2-308.13 *et seq.*; Florida, Fla. Stat. § 68.081 *et seq.*; Georgia, GA. Stat. Ann. § 49-4-168 *et seq.*; Hawaii Haw. Rev. Stat. § 661-21 *et seq.*; Illinois, 740 ILCS 175/1 *et seq.*; Indiana, Ind. Code §5-11-5.5-1 *et seq.*; Iowa, Iowa Code § 685.1 *et seq.*; Louisiana, La. Rev. Stat. Ann. § 46-437.1 *et seq.*; Maine, Me. Rev. Stat. tit. 5 § 215 *et seq.*; Massachusetts, Mass. Gen. Laws Ch. 12 § 5A *et seq.*; Michigan, MCL 400.601 *et seq.*; Minnesota, Minn. Stat. § 15C.01 *et seq.*; Montana, Mon. Code Ann. § 17-8-401 *et seq.*; Nevada, Nev. Rev. Stat. § 357.010 *et seq.*; New Jersey, N.J. Rev. Stat. § 2A:32C-1 *et seq.*; New Mexico, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; New York, NY State Fin. Law Ch. §187 *et seq.*; North Carolina, NC. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma, Okla. Stat. tit. 63 § 5053.1 *et seq.*; Rhode Island, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Virginia, Va. Code Ann. § 8.01-216.1 *et seq.*; Wisconsin, Wis. Stat. § 20.931 *et seq.* (collectively "State False Claims Act" or "State FCA"), to recover for knowingly false claims submitted for payment to the

1

United States and various States through the federal Center for Medicare and Medicaid Services ("CMS").

## SUMMARY OF DEFENDANTS' CONDUCT

Defendants have knowingly engaged in a scheme whereby they operated a "pay-to-play" Speakers Bureau to encourage and reward providers who prescribe Defendants' drugs to Medicare and Medicaid beneficiaries and to exclude those who do not. Forest pays its providers in its Speakers Bureau from $1,000 to $1,750 for each event, together with lavish meals, drinks, and other benefits in exchange for increasing or maintaining the number of prescriptions the provider writes for Defendants' drugs. For approximately 50% of the speaker reward events, there is no educational content or program at all. Forest falsifies "speaker" documentation to falsely indicate the participants, the participants' credentials, and the meal and drink costs per participant and Forest disciplines or rewards its sales force, depending upon their willingness to participate in the pay-to-play kickback scheme.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under the federal FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction over the state FCA claims pursuant to 28 U.S.C. § 1367.

2.      Venue is appropriate as to each Defendant in that one or more of Defendants transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), venue is proper.

2

## PARTIES

3. Plaintiff/Relator Kurt Kroening ("Kroening" or "Relator") is a citizen of the United States and a resident of Germantown, Wisconsin within the Eastern District of Wisconsin. Relator was at all times material employed as a pharmaceutical sales representative by Defendant Forest Pharmaceuticals, Inc. He brings this *qui tam* action based upon direct and unique information personally obtained by him during his employment as a pharmaceutical sales representative with Defendant Forest Pharmaceuticals, Inc. Kroening has direct and independent knowledge on which the allegations set forth in this Complaint are based. Relator has knowledge of the information on which his allegations are based that is independent from any public discourse about the matter and that materially adds to any public disclosures. None of the allegations set forth in this Complaint are based on a public disclosure.

4. Defendant Forest Laboratories, Inc. ("FLI") is a Delaware corporation with its principal place of business at 909 Third Avenue, New York, New York 10022. FLI maintains an office in the State of Wisconsin and does business in every state within the United States.

5. Defendant Forest Pharmaceuticals, Inc. ("FPI") is a wholly owned subsidiary of Defendant Forest Laboratories, Inc. and is a Delaware corporation with its principal offices located 13600 Shoreline Drive, St. Louis, Missouri 63045. FPI is the marketing and sales business unit of Defendant FLI.

6. On information and belief, the two defendant companies operate on a shared management basis.

## STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO FLI AND FPI'S FALSE CLAIMS ACT VIOLATIONS

### A. Federal Government Health Programs

3

### 1. Medicare

7.     The Medicare Program ("Medicare") was created in 1965 as part of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, as a health insurance program administered by the United States government and funded by taxpayer revenue. The Center for Medicare and Medicaid Service ("CMS"), a component of the U. S. Department of Health and Human Services ("HHS"), administers the Medicare program.

8.     Medicare was designed as a health insurance program to provide for the payment of medical services, primarily for the benefit of persons over sixty-five (65) years of age.

9.     A primary benefit of Medicare is the payment for certain prescription drugs, including the drugs sold by Defendants. Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u.

### 2. Medicaid

10.     The Medicaid Program ("Medicaid") was also created as part of the Social Security Act, 42 U.S.C. §§ 1396-1396v, as a health insurance program administered by the United States government and funded by State and Federal taxpayer revenue. Medicaid is overseen by HHS through CMS. The States directly pay providers, partially with funds from the U. S. Treasury. 42 C.F.R. §§ 430.0-430.30. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to qualified financially needy individuals.

### B. False Claims Act, Medicare Fraud, & Abuse Anti-Kickback Statute

### 1. False Claims Act

11.     The FCA, 31 U.S.C. § 3729(a)(1)(A) provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is

4

liable for a civil penalty of up to $11,000 and not less than $5,500 plus three (3) times the amount of damages which the Government sustains because of the act of that person.

10.     The FCA 31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty of up to $11,000 and not less than $5,500 plus three (3) times the amount of damages which the Government sustains because of the act of that person.

11.     The FCA, 31 U.S.C. § 3729(a)(1)(C) makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of up to $11,000 and not less than $5,500.

## 2.   Medicare Fraud & Abuse Anti-Kickback Statute

12.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute") provides for penalties for certain acts impacting Medicare and Medicaid reimbursable services. Specifically the statute prohibits persons who knowingly and willfully solicit or pay remuneration in return for referring or prescribing any prescription which payment may be made by Medicare or Medicaid. *See* 42 U.S.C. § 1320a-7b(1)(B). A person found in violation of this law shall be guilty of a felony and shall be fined up to $25,000 and imprisoned for up to five years. *Id.*

13.     In accordance with the Anti- Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals. *See*, 42 C.F.R. § 1001.952(f) . Such remuneration is a kickback when paid to induce the writing of prescriptions. Kickbacks increase government – funded health benefit program expenses by causing medically

unnecessary expenditures. Kickbacks also compromise the physician's judgment causing the physician to consciously or subconsciously select drug regimens based on financial interest rather than the patient's medical need.

14.     The Balanced Budget Act of 1997 amended the Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three (3) times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

15.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the state Medicaid programs. Compliance with the Anti-Kickback Statute is a *condition of payment* for drug claims administered by physicians for which Medicare or Medicaid reimbursement is sought. Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. Each of the Government Health Care Programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute and with other federal laws governing the provision of health care services in the United States. As such, if a provider informs CMS or its agent that it provided services in violation of the Anti-Kickback Statute (or another relevant law including off label indications), CMS will not pay related claims.

16.     Healthcare providers enter into a Provider Agreement with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. They do so through completing a paper CMS-855 form or the Internet-based Provider Enrollment, Chain and Ownership System ("PECOS"). CMS-855 form requires certification of, in part, the following:

6

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions or participation in Medicare.

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Form CMS-855A (updated 07/11).

17.     Submission for individual claims requires similar provider certification through the CMS-1500 form which states in part, "Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

18.     The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the FCA. The PPACA also amended the Social Security Act's "intent requirement" to clarify that violations of the Social Security Act's anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(h).

**C. FPI and FLI's violations**

19.     The Defendants have violated the Anti-Kickback Statute and the federal FCA and various named State FCAs by engaging in the conduct described herein involving its "pay-to-play" Speakers Bureau program from several years prior to June 2007 when Relator commenced his employment with Defendants as a pharmaceutical sales representative in June 2007 until the present and continuing involving all of its prescription drugs including, but not limited to

7

Bystolic, Lexapro, Namenda, Viibryd, and Savella. Defendants knew that prescriptions obtained through Defendants' "pay-to-play" kickback scheme were paid for by state and federal health care programs which ultimately are funded by the taxpayers. After engaging in its Speakers Bureau kickback scheme, Defendants expected health care providers around the United States to prescribe and administer to their patients and thereafter illegally bill or cause to be billed to state and federal health care programs prescriptions for Forest drugs.

20.     Defendants' schemes, included, but are not limited to the following actions, all of which violate the Federal and State FCAs and Anti-Kickback Statute:

(a)  Knowingly paying money and providing gifts to providers for the purpose of inducing them to prescribe medications manufactured and sold by FLI and FPI;

(b)  Knowingly engaging in return on investment ("ROI") tracking of Continuing Medical Education ("CME") consultants and advisors and of other "speakers", whereby Defendants analyze whether such events are successful in influencing attendees to change their prescription writing practices;

(c)  Conspiring to create unlawful incentives in exchange for patient prescription business;

(d)  Conspiracy to pay money to providers in order to seek assistance from the person(s) receiving the kickbacks and/or gifts in influencing other providers to prescribe medications manufactured and sold by FPI and FLI;

(e)  Falsifying documents to conceal kickbacks; and

(f)  Other unlawful activities as described herein in this Complaint.

8

**FACTUAL BACKGROUND**

A.  **Defendants' Sales and Marketing Training and Directives to Sales Force**

21.     Defendants' corporate Executive Vice President of Marketing is Elaine Hockberg. Defendants maintain a corporate strategy of marketing, training and sales which they disseminate to the FPI sales force in its various districts through corporate training or regional managers, who, in turn, instruct their subordinate managers and supervisors. Defendants also disseminate their strategies through corporate sales and marketing conventions and other training events.

22.     Defendants' pharmaceutical sales division is separated into five (5) geographic areas across the United States in all 50 states. Relator worked in Area 5. Relator's Area Business Director, Cary Renner oversaw the Regional Director of the North Star Region Josh Cox. The North Star Region consists of Wisconsin, Minnesota, the Upper Peninsula of Michigan, North Dakota, South Dakota, Iowa, and parts of Illinois. Cox oversaw Relator's immediate supervisor District Manager Jessie Edwards. Edwards oversaw the Forest Therapeutic Representative Team. Relator was a member of this team that markets and promotes Savella, Bystolic and Viibryd. In or around May 2011, Edwards told Relator, and the rest of the pharmaceutical sales representatives supervised by Edwards, that for "compliance reasons" sales representatives were no longer to communicate via voicemail or e-mail. Edwards also instructed that sales representatives were not to make detailed notes in the FRxsell call note database regarding their methods of marketing or arranging "speaker" events. Edwards instructed that all communications should be done via text messaging on cell phones or through conversations to avoid compliance detection.  Forest also outfitted all sales training rooms with shredders and prohibited sales representatives from removing any sales training materials from the premises.

9

23.     Relator was paid a small base salary plus commission based on the total number of his assigned Forest drugs purchased in his sales and marketing territory.

24.     Sales representatives are compensated through "Incentive Compensation Programs." The Quarter 4, FY 2012 states, in part, "All representatives can earn compensation dollars based on their promoted products. In order for us to achieve our corporate goals, all representatives must maximize growth with Viibryd, Bystolic and Savella. **Those representatives, who exceed their goals and contribute large market share or TRx growth within segments, can receive the largest program awards.**" (emphasis original).

25.     Relator had interaction with Forest pharmaceutical sales representatives who marketed all Forest drug and particularly frequent interaction with Forest pharmaceutical sales representatives who promoted and marketed the same basket of drugs as Relator: Savella, Bystolic and Viibryd. Relator met with FPI sales representatives at national conferences repeatedly throughout each year and maintained on-going communications with many of these sales representatives throughout the country in order to discuss and compare the sales directives of FPI management and to discuss sales strategies, results, performance and discipline and compensation issues.

26.     On August 22, 2011 through August 25, 2011, for example, Relator participated at the "Branded Launch" of Viibryd and Dalisrep in Anaheim, California during which he learned about the national "pay-to-play" speaker reward events. During the Branded Launch, Relator participated in specific discussions regarding Savella, Viibryd and Bystolic with sales representatives from the following states: (1) Arkansas; (2) California; (3) Florida; (4) Georgia; (5) Illinois; (6) Iowa; (7) Minnesota; (8) New Jersey; (9) New Mexico; (10) New York; and (11) Virginia.

10

27.     On March 5, 2012 through March 8, 2012, Defendants conducted a National Sales Meeting with Areas 3 and 5 in Dallas, Texas. At the National Sales Meetings, Defendants create plans of action ("POA"), referred to as "plans of attack".    During breakfast, dinners and while socializing, Relator and sales representatives from around the country discussed illegal marketing and promotion that help increase their market share and sales, including "speaker" events. During the National Sales Meeting in Dallas, Texas, Relator participated in specific discussions regarding illegal marketing of Savella, Bystolic, and Viibryd with sales representatives from the following states: (1) Louisiana; (2) Indiana; (3) Texas; and (4) Michigan.

**B. Defendants' Knowing Violation of Federal and State Anti-Kickback Statutes**

28.     Defendants maintained several company-wide schemes to provide kickbacks to providers for writing prescriptions of Forest drugs all designed to increase prescriptions for Forest drugs by providing or withholding compensation for so doing by 1) making payments for phantom presentations; 2) falsifying documents to show false attendance participation by prescribers and others and by falsifying the credentials of attendees; 3) considering as speakers only doctors who prescribe in the 7th, but generally only the $8$-10th decile for Forest drugs; 4) terminating speakers from the speaker program if they fail to increase or at least maintain the number of prescriptions for Forest drugs; 5) providing compensation of lavish dinners and drinks for doctor and doctors' staff by having the doctor post-sign to falsify his/her presence at a presentation his/her staff attended as a benefit of working for that doctor; and 6) requiring its sales force to actively track provider prescriptions as a basis for determining entry to or expulsion from the speaker award program.

11

29.     Based upon Relator's direct knowledge and experience, Forest directed its pharmaceutical sales representatives throughout the country to "maximize the return on investment" Forest had in its speaker fees, meals, drinks, travel, hotel, cars and drivers, and other payments and expenses related to the speaker reward program by rewarding the high prescribers and incentivizing high potential prescribers.

30.     According to the directives the Forest sales force received, the purpose of the Forest "Speaker Program" was not education about the Forest drugs, but to reward high prescribers and, in some case, to incentivize lesser prescribers with high prescriber potential, all so that speaker program rewards or the withholding of the rewards would influence the providers' decisions about writing prescriptions of Forest drugs and increase sales of Forest drugs resulting from such kickbacks, including those prescriptions submitted to and paid for by government health insurance programs Tri-Care, Medicare, and Medicaid.

31.     Instead of recruiting speakers and consultants based on their experience or credentials, Defendants target physicians based on their actual and potential prescription writing volume.

32.     Throughout Relator's employment with the company, management used the term "return on investment" in reference to Forest's Speakers Program. Relator is aware of company-wide speaker reward practices from his years of participation at national sales meetings, his discussions with staff, supervisors, managers, and sales representatives from throughout the country.

33.     Forest Sales Representatives, such as Relator, were required to arrange six (6) to nine (9) "speaker programs" quarterly in order to avoid financial and job security penalties with regard to their employment. Sales representatives are provided with a budget for such rewards

12

and Relator enjoyed a seemingly unlimited budget for rewarding physicians eligible for Forest's "Speaker Program" rewards.

34.     Kroening's manager, Jessie Edwards, was adamant about frequent speaker reward events programs. He emphasized the need for "paying" speakers and to assure that the chosen "speakers" were writing enough prescriptions of Forest drugs so the Defendants would get a "return on investment" of the expense of the speaker reward payments and lavish meal expenses.

35.     During a June 20, 2012 ride-along with Relator, Forest manager Jesse Edwards instructed Relator to coach Dr. Cheryl Tapp to sell Viibryd more effectively. Edwards was concerned about Forest's "return on investment" since Dr. Tapp was in the speaker reward program and Forest was thus tracking her prescription volume. Edwards told Relator, "We are paying her [Dr. Tapp] to speak on Viibryd and she has only written three prescriptions. If she is not prescribing the medication, how can we pay her to speak on it? If you don't coach her on how to sell Viibryd we will no longer pay her to speak." Edwards told Relator that he "needs to have backbone" when speaking to Dr. Tapp about the relationship between the speaker reward and writing prescriptions. When Relator expressed reluctance to tie in the pay to the play, Edwards told him, "I guess you don't want to win as bad as the rest of the nation." On July 16, 2012, Dr. Tapp was a "speaker", and although two other attendees were listed as in attendance, not all those listed on the speaker form had actually attended.

36.     Forest sales representatives' performance ratings, raises, bonuses, and job security were  based, in part, on speaker reward activity. High performance ratings for sales representatives were based on the number of speaker reward events they scheduled and the amount of money paid directly to providers as speaker awards as well as the more lavish events staged as evidenced by the funds each sales Representative spent for the providers.

13

37.     To facilitate providing these kickbacks to physicians, sales representatives were usually given at least $12,000 as a quarterly budget. Relator was regularly approved for a quarterly budget in excess of $12,000 and up to $26,000 to bring speakers in. He was required to submit his requests for approval of the speakers and was never denied, unless the speaker was not writing enough prescriptions.

38.     Forest placed no importance whatsoever for purposes of employee review on the number of attendees at the reward events or the educational content or actual "speech" or "program". If sales representatives did not schedule sufficient speaker programs, their field ride evaluations would be poor, appearing to mean that the sales representatives were lazy and not spending the money that Forest provided to spend. The result could mean loss of a bonus, raise and/or being placed on a Performance Improvement Plan.

39.     The first step in the "Speaker Program" for the sales representatives is to review the prescription rates for each of the providers in the respective sales representative's territory in Forest's Quick Qlik software system for Forest drugs and competing products. Defendants purchase prescription data from Walgreens, CVS and others to produce and provide to its sales representatives, such as Relator, Quick Qlik software reports to show which drugs providers prescribe on a weekly basis, including drugs competitive to Forest products. Generally sales representatives are restricted to using providers for speakers who are in the 8th to 10th decile, and sometimes in the 7th decile, for writing prescriptions for Forest drugs.

40.     Defendants also tracked the amount of prescriptions of non-speaking physician attendees who were treated to a free gourmet dinner. Defendants use these reports to identify physicians who are currently not prescribing large quantities of Defendants' drugs but have the

ability to do so based upon their patient populations. Managers provide drug sales reports to sales representatives and the sales representatives also have direct access to the Quick Qlik data base.

41.     Defendants target providers with a high number of Medicare and/or Medicaid patients for its speaker reward events. Defendants produce internal reports using Plan Track software that lists the percentage of each provider's patients who are beneficiaries of Medicare, Medicaid, or private insurance patients and what percentage of patients were being prescribed specific drugs. This report is used by sales representatives to target specific providers, for example to focus on use and potential use of Forest drugs designated as "preferred" for Medicaid and/or Medicare, leading to special pricing for beneficiaries and allowing a marketing point to push additional drug sales to beneficiaries of government programs with designated "preferred" drugs.

42.     Plan Track also revealed how many prescriptions the provider is writing for competitor drugs. Plan Track's tabulations treat off-label use prescriptions the same is those on label. Defendants' sales representatives use these reports to target specific physicians for the speaker rewards program who are not high prescribers of Forest's drugs to encourage them to prescribe Defendants' products over those of Forest's competitors.

43.     Defendants pressure their sales representatives to obtain commitments from physicians to write prescriptions for Defendants' drugs by providing the physicians with kickbacks in the form of pay for "speaking" engagements and also for lavish dinners for the provider and sometimes the provider's staff.  Relator's manager, Jesse Edwards, directed Relator to show the prescription reports to his providers, but Edwards added to the directive that "in a court of law I am going to deny this."

15

44.     Once the sales representative plans a speaker reward event, he or she goes to his or her manager for approval. Relator had his planned reward events denied if the prescribing provider did not have a high prescription rate of Forest drugs or if the prescriber has high potential due to its patient population. The approval for a provider to be included in the Forest speaker reward program was made ultimately by the "Physician Validation Group" headed in 2009 by Joe Zimmerman in the Forest Laboratories' compliance Department.

45.     In the event a speaker did not generate significant prescriptions, Forest would terminate the provider from the program. For example, Kroening requested that Dr. Suzanne Grimm participate in a speaker reward event, but he was informed by his manager that Forest had terminated Dr. Grimm from its reward program. When a provider has been terminated from the reward program, the Sales Representative must then submit a "Reinstatement Request" form, signed by the provider, who must attest to having a patient population to whom Forest drugs are appropriate.

46.     Education was not the focus or  even a consideration in the speaker reward events. Sales representatives were not asked for nor did they provide information regarding the content, length, or materials of any "speech" for a speaker reward event, other than the identity the Forest drug for the announcement. Forest maintained a payment limitation of $100,000.00 per year, per provider, per drug for its speaker reward payments. This cap was applied only to direct payments to providers, not to the cost for the lavish meals and drinks, travel or hotel expenses, and sometimes the hosting of the provider's staff in these meals and/or other lunches in the provider's office, as a benefit to the provider's employee program, all of which were charged to the respective sales representative's Forest company American Express card.

16

47.     Forest sales representatives submit approved speaker reward events to the Forest

Speaker Bureau through the internet portal MYeMMaFRX (http://www.myemmafrx.com/ ), an

electronic meeting management system ("eMMa") that tracks the details of Forest "promotional

speaker programs". Wayne Walters, Forest Speaker Bureau Coordinator, has since left the

company.

48.     Once the Forest sales representative enters the speaker reward event into the

eMMA system, the software then generates invitations for the sales representative to hand

deliver.  It also generates the confirmation letter, which includes the reward payment amount of

$1,000.00 or $1,250.00 for local speakers or $1,750.00, for national speakers addressed  to the

participating provider.  It also generates a "PRF" number to track each speaker reward event,

which coordinates with the sales representative's bonus information. Some national speakers

would be paid for three meal events daily for two days, so that, in addition to transportation,

lodging, and lavish meals and drinks, they would be directly paid for 6 events at the $1,750 rate,

for a total payment on investment of $10,500.00, contributing to the potential total of

$100,000.00 per year per drug from Forest.

49.     At the direction of Defendants, Relator only held speaker reward events at upscale

restaurants with lavish dinners and drinks including: (1) Cucina (Kohler, WI); (2) Courthouse

Pub (Manitowoc, WI); (3) Beckett's (Oshkosh, WI); (4) Sebastian's (Fond du Lac, WI); (5)

Black Wolf Run (Kohler, WI); (5) Chop House (Sheboygan, WI); (7) Steffano's (Sheboygan,

WI); (8) Mo's Steakhouse (Milwaukee, WI); (9) Mr. B's (Milwaukee, WI); (10) Poplar Inn

(West Bend); and (11) Lake Park Bistro(Milwaukee, WI).

50.     During or about 2010 and before January 2011, Forest tightened its policies, but

not its practices, for its speaker reward program, to require two provider attendees at speaker

reward events. Specifically by way of example, Relator's manager, Jesse Edwards told Relator, "Nothing's changed; we just have to get more paperwork". Maintaining paperwork to comply with the policies while retaining the same practices required falsification of Speaker Program Attendee Sign-In Sheets. If insufficient attendees were present, Forest managers directed their sales representatives to add individuals who were not present or whose credentials were not as represented. Common directives from management when there were not sufficient attendees to meet policies were to "improvise" or to "add in more names and we are good to go".

51.     Relator has direct and personal knowledge based upon conversations with various sales representatives from across the country—as described *supra*—that Defendants regularly provide compensation for "speaking engagements" even though the recipient of the compensation did  not give a presentation.

52.     Based upon Relator's information and experience, the Forest speaker reward program operated in substantially the same manner throughout the United States. Below are a few specific examples of these wide-spread practices.

53.     In 2010, Relator arranged a luncheon and dinner that was scheduled to feature Dr. Wells as a speaker at both events. Upon information and belief Dr. Alvin Wells is the number one prescriber of Savella in Wisconsin. Dr. Wells was to be paid $2,500 for the events, $1,250 for lunch and $1,250 for dinner. Dr. Wells requested car service for transportation. The event was held at Black Wolf Run in Kohler, Wisconsin, a luxurious resort. Dr. Wells did not present a speech or make a presentation at the luncheon session but was still paid for it. Edwards specifically told Relator to pay Dr. Wells for both speeches even though Relator informed Edwards that Dr. Wells did not speak or present at the luncheon session.

18

54.     Forest management encouraged and approved an event that took place on March 10, 2010 at Theo's Chop House, then one of the most highly rated and most pricey restaurants in the area. Ekaterina Soforo, MD was listed as the "speaker". Forest Sales Representative, Jennifer McMahon, also participated in the event, as did one of the doctor's staff, as a perk of the job. The name of a non-attendee was added the following day.

55.     On January 19, 2011, Forest held a speaker reward event at the Oshkosh County Building for "speaker" Dr. Jeffrey Junig of Fond Du Lac, WI, a speaker for multiple drug companies, although there were no prescribers in attendance. Multiple staff did enjoy a free lunch. Pursuant to management directive, the next day, the Sales Representative obtained signatures from non-attendees Kurtida Ringwalla, MD and Brooke Vanevehaven, Nurse Practitioner.

56.     On November 10, 2011 Forest held a speaker award event program and paid "speaker" Juan Albino, MD of Neenah, Wisconsin $1,000.00 or 1,250.00 for "speaking" only to another Forest speaker reward program participant, Stephen Shopbell, MD of Oshkosh, WI at Dr. Shopbell's office. The following day Dr. Albino's nurse signed the Speaker Program Attendee Sign-In Sheet, indicating she had been in attendance at the "event" the prior day, although she had not.

57.     On February 28, 2012, at a presentation by Dr. Tim Turbett at the Poplar Inn in West Bend, Wisconsin, Relator heard Dr. Turbett state the following to a physician attending the dinner: "I love Bystolic, but I really love my paycheck from Forest." This comment by Dr. Turbett was also overheard by another one of Defendants' sales representatives who was in attendance.

19

58.     During his Forest employment, Relator arranged for Dr. Alvin Wells of Milwaukee, Wisconsin to "speak" at the Wolf River Lodge at the 5 Star Kohler American Club in Kohler, Wisconsin. Forest management provided chauffeured car service round trip from Milwaukee, Wisconsin and paid him for two events at $1,250.00 each, although he was only expected to and did appear at the lavish dinner event.

59.     Based upon Relator's experience and the information he learned from other Forest Sales Representatives, managers and staff throughout the country, only about 50% of the Forest speaker reward events actually any type of program content. Of those that did include any content, the talk was generally only about 5 to 10 minutes and was primarily about the other provider's practice, not specifically about a certain Forest drug. There was no educational requirement for the reward events.

60.     The last step for the Forest Sales Representatives was to review the prescriptions written by the provider *after* the speaker program reward to see if the prescription levels were maintained or increased, to create an Excel spreadsheet depicting the data, and send it to their respective manager. Pursuant to the directives Relator received from management, those providers whose prescriptions increased or, if the level was already high, if the prescription level was at least maintained, were to be continued on in the speaker reward program and, conversely, those providers whose prescriptions did not increase or in some cases at least maintained, were terminated from the speaker reward program because management would require, as they put it, a "return on investment" from the speaker reward program.

61.     Upon information and belief, Defendants have not returned any sums of money to the United States government or the various State governments listed in this complaint as a result of false claims.

20

**COUNT ONE**

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

62.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

63.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

64.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of prescriptions of Forest drugs by virtue of its corporate-wide conduct throughout the United States.

65.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

66.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWO**

**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

67.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

68.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

69.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim for the improper

21

payment or approval of prescriptions of Forest drugs by virtue of its corporate-wide conduct throughout the United States.

70.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

71.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(1)(c)

72.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

73.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

74.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly conspired to commit violations of the False Claims Act for the improper payment or approval of prescriptions of all of its drugs for which it included providers in its Speakers Bureau by virtue of its corporate-wide conduct throughout the United States.

75.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

76.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOUR

### Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901

22

77. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

78. This is a claim for treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901.

79. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Arkansas Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and or conspired to present false or fraudulent claims for payment or approval.

80. The Arkansas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

81. By reason of these payments, the Arkansas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIVE

**California False Claims Act, Cal. Gov't Code § 12651 et seq.**

82. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

83. This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12651 *et seq*.

84. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims for payment or

23

approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

85.     The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

**86.**     By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

<u>COUNT SIX</u>

**Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 et seq.**

87.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

88.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 *et seq*.

89.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and or conspired to present false or fraudulent claims for payment or approval.

90.     The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

91.     By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

24

## COUNT SEVEN

### Connecticut False Claims Act, Conn. Gen. Stat. § 176-301a et seq.

92.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

93.     This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. §176-301a *et seq.*

94.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

95.     The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

96.     By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT EIGHT

### Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 et seq.

97.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

98.     This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 *et seq.*

99. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

100. The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

101. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINE

### District of Columbia False Claims Act, D.C. Code § 2-308.14 et seq.

102. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

103. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq*.

104. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

26

105.    The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

106.    By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TEN

### Florida False Claims Act, Fla. Stat. Ann. § 68.081 et seq.

107.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

108.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

109.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

110.    The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

111.    By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

27

## COUNT ELEVEN

### Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 et seq.

112.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

113.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 *et seq.*

114.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

115.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

116.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWELVE

### Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 et seq.

117.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

118.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*

119.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

120.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

121.    By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTEEN

### Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 et seq.

122.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

123.     This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq*.

124.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

29

125.     The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

126.     By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOURTEEN

### Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5

127.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

128.      This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

129.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

130.     The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

131.     By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIFTEEN

### Iowa Medicaid False Claims Act, Iowa Code § 685.1 et seq.

132.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

133.    This is a claim for treble damages and civil penalties under the Iowa Medicaid False Claims Act, Iowa Code § 685.1 *et seq.*

134.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

135.    The Iowa Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

136.    By reason of these payments, the Iowa Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SIXTEEN

### Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:439.1 et seq.

137.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

138.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.*

31

139.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

140.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

141.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SEVENTEEN

### Maine False Claims Act, Me. Rev. Stats. Ann. tit. 5 § 215 et seq.

142.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

143.    This is a claim for treble damages and civil penalties under the Maine False Claims Act, Me. Rev. Stats. Ann. tit. 5§ 215 *et seq.*

144.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Maine Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

32

145.    The Maine Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

146.    By reason of these payments, the Maine Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINETEEN

### Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O)

147.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

148.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O).

149.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

150.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

151.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

33

## COUNT TWENTY

### Michigan Medicaid False Claim Act, MCLA § 400.601 et seq.

152.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

153.     This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq*.

154.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

155.     The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

156.     By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-ONE

### Minnesota False Claims Act, Minn. Stat. § 15c.01 et seq.

157.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

158.     This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15c.01 *et seq*.

159.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

160.     The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

161.     By reason of these payments, the Minnesota Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-TWO

**Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.**

162.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

163.      This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

164.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

35

165.     The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

166.     By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

<u>**COUNT TWENTY-THREE**</u>

**Nevada False Claims Act, Nev. Rev. Stat. §357.010 et seq.**

167.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

168.     This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*

169.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

170.     The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

171.      By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

36

## COUNT TWEWNTY-FOUR

### New Jersey False Claims Act, N.J. Rev. Stat. Ann. § 2A:32c-1, et seq.

172.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

173.     This is a claim for treble damages and civil penalties under the New Jersey Medicaid Fraud and False Claims Law, N.J. Rev. Stat. Ann. § 2A:32c-1, *et seq*.

174.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

175.     The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

176.     By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-FIVE

### New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978, § 27-14-1 et seq.

177.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

178.     This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978 § 27-14-1 *et seq*.

37

179.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

180.     The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

181.     By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-SIX

### New York False Claims Act, N.Y. State Fin. Law § 187 et seq.

182.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

183.     This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*

184.      By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

38

185. The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

186. By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWEWNTY-SEVEN

### North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, et seq.

187. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

188. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq*.

189. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

190. The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

191. By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-EIGHT

### Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 et seq.

192.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

193.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63§ 5053 *et seq*.

194.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

195.    The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

196.    By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-NINE

### Rhode Island State False Claims Act, R.I. Gen. Law § 9-1.1-1 et seq.

197.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

198.    This is a claim for treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Law § 9-1.1-1 *et seq.*

40

199.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

200.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

201.    By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTY

**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.**

202.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

203.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act§ 71-5-181 *et seq.*

204.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

41

205.    The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

206.    By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT THIRTY-ONE

**Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq.**

207.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

208.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

209.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

210.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

211.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

42

## COUNT THIRTY-TWO

### Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

212.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

213.     This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq*.

214.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

215.     The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

216.     By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT THIRTY-THREE

### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931

217.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

218.     This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931.

43

219. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

220. The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

221. By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

(i) Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the State False Claims Acts;

(ii) Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States under similar provisions of the State False Claims Acts;

(iii) Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

(iv) Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

(v) Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

44

(vi)     Defendants disgorge all sums by which they have been enriched unjustly by their

wrongful conduct; and

(vii)    The United States, the States, and Relators recover such other relief as the Court

deems just and proper.

**Dated at Milwaukee, Wisconsin this 13th day of June, 2014.**


By: s/Mary C. Flanner

Nola J. Hitchcock Cross
WI SBN 1015817
Mary C. Flanner
WI SBN 1013095
Attorneys for Plaintiff/Relator
Cross Law Firm, S.C.
845 North 11th Street
Milwaukee, WI 53233
Telephone (414) 224-0000
Fax (414) 273-7055
njhcross@crosslawfirm.com
mflanner@crosslawfirm.com