UNITED STATES *ex rel.* KURT KROENING,

KURT KROENING,

STATE OF ARKANSAS *ex rel.* KURT KROENING,

STATE OF CALIFORNIA *ex rel.* KURT KROENING,

STATE OF COLORADO *ex rel.* KURT KROENING,

STATE OF CONNECTICUT *ex rel.* KURT KROENING,

STATE OF DELAWARE *ex rel.* KURT KROENING,

DISTRICT OF COLUMBIA *ex rel.* KURT KROENING,

STATE OF FLORIDA *ex rel.* KURT KROENING,

STATE OF GEORGIA *ex rel.* KURT KROENING,

STATE OF HAWAII *ex rel.* KURT KROENING,

STATE OF ILLINOIS *ex rel.* KURT KROENING,

STATE OF INDIANA *ex rel.* KURT KROENING,

STATE OF IOWA *ex rel.* KURT KROENING,

STATE OF LOUISIANA *ex rel.* KURT KROENING,

COMMONWEALTH OF MASSACHUSETTS *ex rel.* KURT KROENING,

STATE OF MICHIGAN *ex rel.* KURT KROENING,

STATE OF MINNESOTA *ex rel.* KURT KROENING,

STATE OF MONTANA *ex rel.* KURT KROENING,

Civil Action File No.:
12-CV-00366

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER 31 U.S.C. § 3730 FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS**

Jury Trial Demanded

Case 2:12-cv-00366-WED   Filed 02/05/16   Page 1 of 97   Document 67

STATE OF NEVADA *ex rel.* KURT KROENING,

STATE OF NEW JERSEY *ex rel.* KURT KROENING,

STATE OF NEW MEXICO *ex rel.* KURT KROENING,

STATE OF NEW YORK *ex rel.* KURT KROENING,

STATE OF NORTH CAROLINA *ex rel.* KURT

KROENING,

STATE OF OKLAHOMA *ex rel.* KURT KROENING,

STATE OF RHODE ISLAND *ex rel.* KURT KROENING,

STATE OF TENNESSEE *ex rel.* KURT KROENING,

STATE OF TEXAS *ex rel.* KURT KROENING,

COMMONWEALTH OF VIRGINIA *ex rel.*
KURT KROENING,

STATE OF WISCONSIN *ex rel.* KURT
KROENING,

               Plaintiffs/Relator,

 v.

FOREST PHARMACEUTICALS, INC.

     and

FOREST LABORATORIES, LLC.

              Defendants.

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 7

II. JURISDICTION AND VENUE ......................................................................................... 7

III. PARTIES ........................................................................................................................... 8

IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ....................................................... 9

A. False Claims Act .............................................................................................................. 9

B. Medicare Anti-Kickback Statute ..................................................................................... 9

C. Medicare, Medicaid and Other Federal Health Programs ............................................. 11

    1. Medicare ...................................................................................................................... 11

    2. Medicaid ...................................................................................................................... 13

    3. Other Federal Healthcare Programs ............................................................................ 14

V. FACTUAL BACKGROUND COMMON TO ALL COUNTS ....................................... 14

A. Defendants Are Primarily Drug Peddlers, Operating a National, Corporate-Driven Kickback
Scheme Partially Disguised as a Speakers Bureau, Prohibited by the Terms of a September, 2010
Corporate Integrity Agreement with the United States. ...................................................... 14

B. Knowing They Were Violating the FCA with Their Kickbacks, Including the Speaker Program,
Forest Made Every Attempt to Hide its Kickbacks to Prescribers. ..................................... 18

C. Forest Pharma Sales Organization ................................................................................... 19

D. The Kick-Back Scheme Involved Payments to Physicians Tied to Their Prescription Activity ...... 20

VI. DEFENDANTS' FRAUDULENT CONDUCT ............................................................... 22

A. Defendants' Corporate Sales and Marketing Training and Directives to its Sales Force
Nation-Wide Tied Money and Other Compensation Paid or Provided to Prescribers to "Return
on Investment" Measured by the Prescriptions of Forest Drugs Written by the Prescribers. .......... 22

B.Kickbacks for Access & Prescription Activity .................................................................. 27

C.Direct Payment Kickbacks for Speaker Events ................................................................ 29

D. Defendants' Knowing Violation of Federal and State Anti-Kickback Statutes ............................ 31

E. Forests' Payments to Physicians Were Tied to Their Prescription Activity, Not their Speaker
Qualifications. ...................................................................................................................... 33

    1. Forest Created a National System for Tracking Physicians' Weekly Prescriptions &
    Required All of Its Pharmaceutical Sales Representatives to Base Speaker Payments on
    Prescription Volume. ....................................................................................................... 33

    2. On a Corporate Level, Forest Pharma Assured the Speaker Payments Were Tied to
    Prescription Volume of Forest Drugs. ............................................................................ 36

3

F. Throughout the Country All Forest Pharmaceutical Representatives Followed the "Pay-to Play" Scheme at the Boots on the Ground Level with the Physicians Whose Prescription Activity they Closely Tracked to Assure a "Return on Investment". ....................................................... 38

    Dr. Emilio C. Gatti ............................................................................................... 39

    Dr. Cheryl Tapp ..................................................................................................... 39

    Dr. Alvin F. Wells ................................................................................................. 47

    Dr. Ekaterina Soforo ............................................................................................. 48

    Dr. Jeffrey Junig .................................................................................................... 49

    Dr. Juan Albino-Rodriguez ................................................................................... 50

    Dr. Stephen Shopbell ............................................................................................ 50

    Dr. Timothy Turbett .............................................................................................. 51

    Dr. Simon Llewellyn ............................................................................................. 52

    Dr. Alfred Neuhoff ............................................................................................... 52

G. Prescriber Prescription Activity Was Tied So Closely to "Speaker" Payments, that Forest Pharma Terminated Prescribers for Speaker Payments if the Prescriber Did not Increase their Prescriptions after Such Payments. ........................................................................................ 53

    Dr. Suzanne Beth Grimm ...................................................................................... 53

H. In Addition to Bribes for Speaker "Events", Forest Pharma also Required all of its Pharmaceutical Sales Representatives to Provide Breakfasts, Snacks, and Lavish Luncheon and Dinner Food and Drinks to Prescribers in Exchange for Prescriptions of its Drugs. .......................... 54

    Dr. Kurtida Ringwalla ........................................................................................... 54

**VII. FOREST PHARMA CONSPIRED WITH THE PHYSICIANS TO CONCEAL KICKBACKS AS SPEAKER PAYMENTS IN EXCHANGE FOR INCREASED PRESCRIPTIONS OF FOREST LABS' DRUGS** ....................................................................... 55

**VIII. FOREST PHARMACEUTICALS DISCRIMINATED AGAINST RELATOR WITH REGARD TO PAY, DISCIPLINE, TERMS AND CONDITIONS OF EMPLOYMENT AND CONSTRUCTIVE DISCHARGE BECAUSE HE ATTEMPTED TO STOP FALSE CLAIMS** ..................................................................................................................................... 57

**IX. COUNTS** ............................................................................................................... 63

COUNT ONE False Claims Act, 31 U.S.C. § 3729(a)(1)(A) .............................................. 63

COUNT TWO False Claims Act, 31 U.S.C. § 3729(a)(1)(B) ............................................. 63

COUNT THREE False Claims Act, 31 U.S.C. § 3729(a)(1)(c) ........................................... 64

COUNT FOUR Retaliatory Discrimination and Constructive Discharge in Violation of 31 U.S.C. § 3730(h) ............................................................................................................................. 65

COUNT FIVE Violation of Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901 by Paying Kickbacks to Providers for Prescribing Forest Drugs .......................... 66

4

COUNT SIX Violation of California False Claims Act, Cal. Gov't Code § 12651 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................67

COUNT SEVEN Violation of Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs................................68

COUNT EIGHT Violation of Connecticut False Claims Act, Conn. Gen. Stat. § 176-301a et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs......................................................69

COUNT NINE Violation of Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................70

COUNT TEN Violation of District of Columbia False Claims Act, D.C. Code § 2-308.14 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs......................................................71

COUNT ELEVEN Violation of Florida False Claims Act, Fla. Stat. Ann. § 68.081 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................72

COUNT TWELVE Violation of Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs ...........................................73

COUNT THIRTEEN Violation of Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................74

COUNT FOURTEEN Violation of Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................75

COUNT FIFTEEN Violation of Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5 by Paying Kickbacks to Providers for Prescribing Forest Drugs..........................77

COUNT SIXTEEN Violation of Iowa Medicaid False Claims Act, Iowa Code § 685.1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................78

COUNT SEVENTEEN Violation of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:439.1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.........79

COUNT EIGHTEEN Violation of Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O) by Paying Kickbacks to Providers for Prescribing Forest Drugs .......................................80

COUNT NINETEEN Violation of Michigan Medicaid False Claim Act, MCLA § 400.601 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs......................................................81

COUNT TWENTY Violation of Minnesota False Claims Act, Minn. Stat. § 15c.01 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................................................82

COUNT TWENTY-ONE Violation of Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs ...........................................83

COUNT TWENTY-TWO Violation of Nevada False Claims Act, Nev. Rev. Stat. §357.010 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs......................................................84

COUNT TWENTY-THREE Violation of New Jersey False Claims Act, N.J. Rev. Stat. Ann. § 2A:32c-1, et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs .........................85

COUNT TWENTY-FOUR Violation of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978, § 27-14-1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs................86

COUNT TWENTY-FIVE Violation of New York False Claims Act, N.Y. State Fin. Law § 187 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs ................................................. 87

COUNT TWENTY-SIX Violation of North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs ........................................... 88

COUNT TWENTY-SEVEN Violation of Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs......................... 90

COUNT TWENTY-EIGHT Violation of Rhode Island State False Claims Act, R.I. Gen. Law § 9-1.1-1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs.............................. 91

COUNT TWENTY-NINE Violation of Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs........................ 91

COUNT THIRTY Violation of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs............................ 93

COUNT THIRTY-ONE Violation of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs ........................ 94

COUNT THIRTY-TWO Violation of Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931 by Paying Kickbacks to Providers for Prescribing Forest Drugs................................ 95

**X. PRAYER FOR RELIEF** ............................................................................................................. 96

NOW COMES KURT KROENING, Plaintiff/Relator, through his attorneys, Cross Law Firm, S.C., by Nola J. Hitchcock Cross and Mary C. Flanner, and as and for his allegations on behalf of the UNITED STATES OF AMERICA, the captioned STATES and DISTRICT, and himself against FOREST LABORATORIES, LLC. ("Forest Labs") and FOREST PHARMACEUTICALS, INC. ("Forest Pharma"), (collectively referred to as "Defendants" or "Forest"), Kroening states as follows:

## I.    INTRODUCTION

1.    This complaint, filed under the federal and state false claims acts, alleges that Defendants provided kickbacks to physicians for prescribing prescription drugs peddled by Defendants.  These kickbacks took the form of direct payments to physicians through a largely sham Speaker Program and other compensation such as lavish meals, liquor, travel and lodging and meals provided to physicians' office staff.  In addition, the complaint alleges that when Relator Kurt Kroening attempted to stop the false claims, he was disciplined and forced out of the company.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action under the federal FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction over the state FCA claims pursuant to 28 U.S.C. § 1367.

3.    Venue is appropriate as to each Defendant in that one or more of Defendants transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), venue is proper.

7

### III.   <u>PARTIES</u>

     4.     **Plaintiff/Relator Kurt Kroening** ("Kroening" or "Relator") is a citizen of the United States and a resident of Germantown, Wisconsin within the Eastern District of Wisconsin. Relator was employed as a Pharmaceutical Sales Representative by Forest Pharmaceuticals, Inc. from June 2007 until November 2012. Kroening has direct and independent knowledge on which the allegations set forth in this Complaint are based independent from any public discourse about the matter and that materially adds to any public disclosures.

     5.     Defendant Forest Laboratories, LLC ("Forest Lab") is a Delaware limited liability company and a successor in interest to Forest Laboratories, Inc. with its principal place of business at 909 Third Avenue, New York, New York 10022. Founded in 1954, Forest Laboratories maintains an office in the State of Wisconsin and does business in every state within the United States.

     6.     Defendant Forest Pharmaceuticals, Inc. ("Forest Pharma") is a wholly owned subsidiary of Defendant Forest Laboratories, LLC. and is a Delaware corporation with its principal offices located 13600 Shoreline Drive, St. Louis, Missouri 63045. Forest Pharmaceuticals is the marketing and sales business unit of Defendant Forest Laboratories.

     7.     The two defendant companies operate on a shared management basis.

     8.     Forest was purchased on July 1, 2014 by Actavas pic. Actavis is the direct parent of Tango US Holdings Inc., which is the direct parent of Forest.

8

## IV.   STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. False Claims Act

9.      The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 and not less than $5,500, adjusted for inflation, plus three (3) times the amount of damages which the Government sustains because of the act of that person.

10.      The FCA 31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty of up to $11,000 and not less than $5,500 plus three (3) times the amount of damages which the Government sustains because of the act of that person.

11.      The FCA, 31 U.S.C. § 3729(a)(1)(C) makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of up to $11,000 and not less than $5,500.

12.      The FCA, 31 U.S.C. § 3730(h) provides for damages for discrimination against persons attempting to stop false claims.

### B. Medicare Anti-Kickback Statute

13.      The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute") provides for penalties for certain acts impacting Medicare and Medicaid reimbursable services. Specifically the statute prohibits persons who

9

knowingly and willfully solicit or pay remuneration in return for referring or prescribing

any prescription which payment may be made by Medicare or Medicaid. *See* 42 U.S.C. §

1320a-7b (1)(B). A person found in violation of this law shall be guilty of a felony and

shall be fined up to $25,000 and imprisoned for up to five years. *Id.*

14.     In accordance with the Anti- Kickback Statute, Medicare regulations

directly prohibit providers from receiving remuneration paid with the intent to induce

referrals or business orders, including the prescription of pharmaceuticals. *See*, 42

C.F.R. § 1001.952(f). Such remuneration is a kickback when paid to induce the

writing of prescriptions. Kickbacks increase government – funded health benefit

program expenses by causing medically unnecessary expenditures. Kickbacks also

compromise the physician's judgment causing the physician to consciously or

subconsciously select drug regimens based on financial interest rather than the

patient's medical need.

15.     The Balanced Budget Act of 1997 amended the Anti-Kickback Statute to

include administrative civil penalties of $50,000 for each act violating the Anti-

Kickback Statute, as well as an assessment of not more than three (3) times the amount

of remuneration offered, paid, solicited, or received, without regard to whether a portion

of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. §

1320a-7a(a).

16.     Compliance with the Anti-Kickback Statute is a *condition of payment* for

drug claims administered by physicians for which Medicare or Medicaid reimbursement

is sought. Reimbursement practices under all Government Health Care Programs

closely align with the rules and regulations governing Medicare reimbursement. Each of

the Government Health Care Programs requires every provider who seeks payment

from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute and with other federal laws governing the provision of health care services in the United States. As such, if a provider informs CMS or its agent that it provided services in violation of the Anti-Kickback Statute (or another relevant law including off label indications), CMS will not pay related claims.

17. The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the FCA. The PPACA also amended the Social Security Act's "intent requirement" to clarify that violations of the Social Security Act's anti-kickback provisions may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(h).

### C. Medicare, Medicaid and Other Federal Health Programs

#### 1. Medicare

18. The Medicare Program ("Medicare") was created in 1965 as part of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, as a health insurance program administered by the United States government and funded by taxpayer revenue. The Center for Medicare and Medicaid Service ("CMS"), a component of the U. S. Department of Health and Human Services ("HHS"), administers the Medicare program.

19. Medicare was designed as a health insurance program to provide for the payment of medical services, primarily for the benefit of persons over sixty-five (65) years of age.

20. A primary benefit of Medicare is the payment for certain prescription drugs, including the drugs sold by Defendants. Reimbursement for Medicare claims is

11

made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u.

21.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w101(a)(3)(A); 42 C.F.R. § 423.30(a). Prior to passage of the Act, with a few limited exceptions, Medicare did not cover outpatient prescription drugs. The new Medicare prescription drug benefits program became effective January 1, 2006. 42 U.S.C. § 1395w-101(a)(2).

22.     Unlike coverage in Medicare Parts A and B, Part D coverage is not provided within the traditional Medicare program. Medicare Part D is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans.

23.     Part D benefits are delivered by a Part D Plan Sponsor, which is either a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan (MA-PD plan), a Program of All-inclusive Care for the Elderly ("PACE") organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

24.     CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities contain language obligating the pharmacy to comply with all

applicable federal laws, regulations, and CMS instructions. 42 C.F.R. §
423.505(i)(4)(iv).

### 2. Medicaid

25.     The Medicaid Program ("Medicaid") was also created as part of the
Social Security Act, 42 U.S.C. §§ 1396-1396v, as a health insurance program
administered by the United States government and funded by State and Federal taxpayer
revenue. Medicaid is overseen by HHS through CMS. The States directly pay providers,
partially with funds from the U. S. Treasury. 42 C.F.R. §§ 430.0-430.30. Medicaid was
designed to assist participating states in providing medical services, durable medical
equipment and prescription drugs to qualified financially needy individuals.

26.     The federal government also separately matches certain state expenses
incurred in administering the Medicaid program. While specific Medicaid coverage
guidelines vary from state to state, Medicaid's coverage is generally modeled after
Medicare's coverage, except that Medicaid usually provides more expansive coverage
than does Medicare.

27.     Medicaid, since its beginning, generally has had broad coverage for
prescription drugs, including self-administered drugs. Nearly every state has opted to
include basic prescription drug coverage in its Medicaid plan.

28.     Medicaid pays for services pursuant to plans developed by the states and
approved by the U.S. Department of Health and Human Services ("HHS") through
CMS. 42 U.S.C. §§ 1396a(a)-(b). After states pay doctors, hospitals, pharmacies, and
other providers and suppliers of medical items and services according to rates the states
establish, the federal government then pays each state a statutorily-established share of

"the total amount expended ... as medical assistance under the State plan...." See 42

U.S.C. §§ 1396b(a)(1), 1396b(a)(1), and 1903(a)(1). This federal-to-state payment is

known as federal financial participation ("FFP").

### 3. Other Federal Healthcare Programs

29.     The Federal Government administers other health care programs similarly

predicated on anti0kickback statutes. TRICARE/CHAMPUS, administered by the

United States Department of Defense is a health care program for individuals and

dependents affiliated with the armed forces.  10 U.S.C. §§ 1071 *et seq*.; 32 C.F.R.

§ 199.4(a). CHAMPVA, administered by the United States Department of Veterans

Affairs, is a health care program for the families of veterans with 100 percent service-

connected disability.  38 U.S.C. §§ 1781 *et seq*.; 38 C.F.R. § 17.270(a). The Federal

Employees' Compensation Act provides workers' compensation coverage, including

coverage of medical care received as a result of a workplace injury, to federal and postal

employees.  The Act is administered by the Department of Labor, Division of Federal

Employees' Compensation.  5 U.S.C. §§ 8101 *et seq*.; 20 C.F.R. §§ 10.0 *et seq*. Federal

Employee Health Benefits Program ("FEHBP") provides healthcare benefits to federal

employees.

### V.     FACTUAL BACKGROUND COMMON TO ALL COUNTS

**A. Defendants Are Primarily Drug Peddlers, Operating a National,
Corporate-Driven Kickback Scheme Partially Disguised as a Speakers
Bureau, Prohibited by the Terms of a September, 2010 Corporate Integrity
Agreement with the United States.**

30.     Forest Laboratories, LLC. develops, manufactures and sells branded

forms of prescription drugs, including  **Bystolic**, a beta-1 selective beta-blocker with

14

vasodilating properties; **Namenda**, a moderate-affinity, uncompetitive N-methyl-D-Aspartate receptor agonist for the treatment of moderate and severe Alzheimer's disease with health-threatening side-effects; **Savella**, a serotonin and norepinephrine reuptake inhibitor for the management of fibromyalgia, also with health threatening side-effects; and **Viibryd**, an anti-depressant.

31.    Unlike most other pharmaceutical companies which develop their own drugs, Forest Pharma primarily sells prescription drugs which Forest Labs licenses from other companies who have developed them.  Thus, other than identifying drugs to license, Defendants' operation is focused on pushing prescription drug sales through personal contacts with prescribers, including those whose patients are government healthcare beneficiaries.

32.    In his Letter to Shareholders as part of Forest Lab's 2011 annual report, its Chairman, Chief Executive Officer and President, Howard Solomon, stated:

> We still do not do discovery research and we are reluctant to take on products at the preclinical stage of development, ....
>
> Launching of course is only the beginning.  Then we have to effectively market each product.  To handle all these launches we have to increase the size of our sales forces, an unusual necessity in today's pharmaceutical environment in which most companies are reducing their sales forces.  It is true that it is increasingly difficult to achieve access to prescribers, but we believe it is still the most effective way of communicating our products' virtues.

33.    Solomon's above statement that "it is increasingly difficult to achieve access to prescribers" resulted from the policy many healthcare providers were adopting in and around that time to prohibit physicians from having lunches with or receiving drug samples from Pharmaceutical Sales Representatives.  Within this environment, Forest created an elaborate kickback scheme, orchestrated nationally and communicated to its

15

sales force at National launches and at the Area, Divisional, Regional and Territory level
to the entire salesforce.

34.     On September 15, 2010, the Department of Justice announced that it had
settled a False Claims Act case and criminal charges for obstruction of justice against
Forest for a combined total payment of $313 Million Dollars.  The Department of Justice's
press release included the following statements: "Forest Pharmaceuticals deliberately
chose to pursue corporate profits over its obligations to the FDA and the American
public."

35.     The same Department of Justice press release included the following
information:

> The charges further alleges that, on Aug. 7, 2003, the FDA
> sent a warning letter advising that Forest Pharmaceuticals was
> no longer entitled to distribute its unapproved Levothroid
> product because the company had made a deliberate decision
> not to comply with the FDA's distribution phase-out plan.
> After receiving the warning letter, Forest Pharmaceuticals
> directed its employees at its St. Louis distribution center to
> work overtime until approximately 1:00 a.m. the following
> morning and, during that time, to continue shipping as much of
> its unapproved Levothroid as possible.

36.     The Department of Justice press release also recounted that the allegations
against Forest included the following:

> The civil complaint further alleges that Forest used illegal kickbacks to
> induce physicians and others to prescribe Celexa and Lexapro.
> Kickbacks allegedly included cash payments disguised as grants or
> consulting fees, expensive meals and lavish entertainment. The civil
> complaint alleges that as a result of the foregoing conduct, Forest
> caused false claims to be submitted to federal health care programs.

37.     On the same day, September 15, 2010, Forest executed a 5-year Corporate
Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United

16

States Department of Health and Human Services ("HHS") as a precondition to the overall settlement of civil and criminal charges.

38.     The Corporate Integrity Agreement required (at p. 28 of 61) a Speaker Monitoring Program, direct field observations of sales representatives, and monitoring and review of records relating to sales representatives interactions with physicians and other prescribers.  Further, the systems and processes were required to assure a "centrally managed pre-set structure determined based on a fair-market value analysis conducted by Forest."  Forest was required to centrally track the aggregate amount paid to speakers and have certified evaluations by sales representatives as to whether speakers complied with Forest requirements.

39.     In his letter to shareholders in the 2011 Annual Report, Solomon also had to alert shareholders:  "As many of you know, I have received a notice from the Department of Health and Human Services, Office of Inspector General (OIG) that it is considering "excluding" me from participation in matters involving any payments by the U.S. Government for our products."  He added that its operational group "Marketing and Sales" was "thirsty to undertake more and more challenges", citing employee "loyalty"  as a "priceless treasure" to the Sales and Marketing operation.

40.     To seek out this "priceless treasure" of  a "loyal"  sales force Forest Pharma frequently recruited car rental employees who were used to fast-pace sales tactics, had no knowledge whatever of drug products, and whose salary and bonuses would be far outpaced by those offered by Forest Pharmaceuticals.

41.     Relator Kurt Kroening commenced employment as a Pharmaceutical Sales Representative for Forest in June 2007.  He was very involved with the "Pay-to-Play" corporate Speaker Program both before and after the Corporate Integrity Agreement

became effective in 2010. He is aware from personal knowledge, that on a national

corporate level, the "Pay- to-Play" scheme actively continued after the Corporate Integrity

Agreement was in place, albeit in a more covert manner.

**B. Knowing They Were Violating the FCA with Their Kickbacks, Including the Speaker Program, Forest Made Every Attempt to Hide its Kickbacks to Prescribers.**

42.     Following execution of the Corporate Integrity Agreement, Forest Pharma

notified its sales force that its Compliance Department would have to monitor emails from

them and that they were therefore to use only phone and text messages to communicate

with managers or physicians regarding their discussions with or payments or other

compensation to physicians.

43.     Previously, the Forest Pharma sales force entered detailed notes of

discussions with providers regarding kickbacks and speaker payment events into the

company's FRxsell call note database. Following the execution of the CIA, Forest

Pharma prohibited its sales force from entering any such data regarding kickbacks and

speaker events into the data base.

44.     In or around May 2011 Territory Manager Jessie Edwards gave specific

instruction to the North Star Territory sales force not to use voice mail, email or the

FRXsell call note data base on instructions from corporate compliance as those methods

of communication were going to be monitored.

45.     In addition, for emails to the sales force, code terms were adopted so that

all company personnel were clear when communications were disseminated, such as using

the term "thought leader" for a speaker with a high volume of Forest drug prescriptions

and the term "return on investment" (also "ROI") to describe whether a provider had

18

increased prescriptions of Forest Pharma's drugs after receiving kickbacks. The code term "A Target" meant a high prescribing physician in a relevant specialty area and a "B Target" was a provider in a specialty area who should be able to become a high prescriber.

46. Following the execution of the Corporate Integrity Agreement, Forest Pharma also purchased numerous shredders, equipped all sales training rooms with shredders, and prohibited sales representatives from removing any sales training materials from the rooms, as everything had to be shredded and could not leave the rooms.

### C. Forest Pharma Sales Organization

47. Defendants' Pharmaceutical Sales Division is separated into six (6) geographic Areas across the United States in all 50 states, which are in turn organized into Regions and then split into Divisions and then into Territories.

48. Relator worked in Area 5, with Area Business Director Cary Renner. Area 5 includes Wisconsin, Illinois, Iowa, Texas, Louisiana, North Dakota, South Dakota, Nebraska, Missouri, Kansas, Oklahoma, Mississippi, Alabama, Indiana, Kentucky, and Minnesota. Relator's Area Business Director, Cary Renner oversaw the Regional Director of the North Star Region, Josh Cox.

49. The North Star Region consists of Wisconsin, Minnesota, the Upper Peninsula of Michigan, North Dakota, South Dakota, Iowa, and parts of Illinois. As Regional Manager, Cox oversaw Relator's immediate supervisor, District Manager Jessie Edwards, who oversaw the Forest Therapeutic Representative Team.

50. Relator participated in national sales launch meetings with all national sales and marketing officers and all sales representatives in Forest Pharmaceuticals. He

19

also participated in area sales meetings, generally with his Area 5 and with Area 3, which included Georgia, Florida and Tennessee and national and area sales management.

### D. The Kick-Back Scheme Involved Payments to Physicians Tied to Their Prescription Activity.

51.     While each government-funded healthcare program establishes its own reimbursement criteria, none knowingly pays for medications that are not prescribed for a medically accepted indication or that are prescribed as a result of false or misleading information disseminated by pharmaceutical manufacturers to either payors or healthcare providers. In addition, none of the government-funded healthcare programs willingly pay for drugs that were prescribed as the result of the pharmaceutical manufacturer's unlawful inducements or unlawful marketing activities.

52.     During the relevant time period, Forest caused the dispensing of thousands of its drugs through its illegal kickback scheme inducing providers to prescribe its drugs.

53.     Forest knowingly caused its speaker providers and attendees at its kickback events to write prescriptions for their patients who then caused the pharmacies filling those prescriptions to submit false or fraudulent claims to government programs which had been induced by illegal payments paid as kickbacks.

54.     Forest knowingly caused the pharmacies to submit false certifications to obtain payment for government programs that were material to the payment of claims.

55.     From at least June 2007 through at least 2012, Forest Pharma violated the Anti-Kickback Statute, the federal FCA, and various named State FCAs by systematically bribing doctors through its "pay-to-play" compensation to providers, including its Speakers Program, to induce providers to prescribe Bystolic, Namenda, and Savella, and Viibryd.

20

56.     Forest Pharmaceuticals sold these drugs in a national scheme through its corporate Speakers Bureau and its national network of sales representatives.  Forest Pharma induced doctors to prescribe these drugs through the use of "sham" speaker events used to make direct payments to physicians and also through lavish training events, meals, lodging and transportation, and coffees, breakfasts, and snacks for prescribers and their staff.

57.     Defendants knew that a significant portion of prescriptions leveraged through Forest Pharma's "Pay-to-Play" kickback scheme were paid for by state and federal health care programs funded by the taxpayers. Defendants expected health care providers throughout the United States to prescribe Forest Labs' drugs, including those Defendants knew would be paid for by the taxpayers.

58.     Defendants' schemes, included, but are not limited to the following actions, all of which violate the Federal and State FCAs and Anti-Kickback Statute:

a) Knowingly paying money and providing gifts to providers for the purpose of inducing them to prescribe medications manufactured and sold by Forest Laboratories and Forest Pharmaceuticals;

b) Knowingly engaging in return on investment ("ROI") tracking of "speakers" and other providers receiving compensation from Forest Pharma, whereby Defendants obtain and review weekly prescription data to determine whether the kickbacks should be continued based upon whether they have resulted in increased prescriptions of Forest Labs' drugs;

c) Conspiracy with providers to pay money or other compensation in exchange for increased prescription activity; and

21

d) Falsifying documents to conceal kickbacks.

59.     Forests' knowledge of its intentional wrongdoing was brought home to its sales force throughout the country by the surreptitious manner in which the scheme was carried out and the lengths to which Forest had to go to attempt secrecy and loyalty by its salesforce who were commanded by the company's national officers to engage in the Pay-to-Play schemes as conditions of employment.

## VI.     DEFENDANTS' FRAUDULENT CONDUCT

**A. Defendants' Corporate Sales and Marketing Training and Directives to its Sales Force Nation-Wide Tied Money and Other Compensation Paid or Provided to Prescribers to "Return on Investment" Measured by the Prescriptions of Forest Drugs Written by the Prescribers.**

60.     Although Forest Pharma's corporate kickback policies were continuously discussed with its sales representatives within each territory, at each drug launch they were also reviewed by the corporate Sales & Marketing officers before an audience that included the company's entire nation-wide sales staff, including those who sold Forest drugs in Arkansas, California,  Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas and Virginia.

61.     For example, Director of Sales and Marketing Elaine Hockburg, Senior Vice Presidents of Sales, Gerald Azzari ("Azzari") and Jerry Lynch ("Lynch") addressed all of Forest Pharma's Pharmaceutical Sales Representatives together at the National Bystolic Launch Meeting on January 21st through January 24th, 2008 in San Francisco, California.   Azzari and Lynch tried to pump up the Pharmaceutical Sales Representatives

Case 2:12-cv-00366-WED   Filed 02/05/16   Page 22 of 97   Document 67

with promises of higher compensation in exchange for "Return on Investment", meaning increasing prescriptions through compensation to prescribers.

62.     Relator participated in the National Bystolic Launch Meeting in January 2008 where Forest Pharma's national officers announced the monthly budgets for its sales representatives.  Although the amount changed from time to time and from drug to drug, the range was from about $120,000 to $144,000 dollars annually *per drug* as a minimum from at least June 2007 to at least November 2012.  Eight different sales representatives covered Relator's territory in the Fox Valley, Wisconsin, providing $1,152,000 *per drug* per year for physician kickbacks as the minimum budget.

63.     As made clear in no uncertain terms at the National Bystolic Launch Meeting in January 2008 by Azzari and Lynch, Forest Pharma's national sales representatives were required as a condition of employment to spend their entire monthly budget for direct payments or other compensation to prescribers or potential prescribers of Forest Pharma's drugs.

64.     At the National Bystolic Launch Meeting, national officers Azzari and Lynch told all sales representatives that paying out all of their budgeted compensation to prescribers and in turn tracking prescribers' related prescription activity was the most important part of their job duties.

65.     During the National Bystolic Launch Meeting, Azzari and Lynch referred to prescribers as "targets" and to nationally listed speakers as "high prescribers", such as **Dr. Elijah Saunders**, who also participated in the presentation. They also used the term "thought leaders" interchangeably with the term "high prescribers" and "targets".

66.     At the National Bystolic Launch Meeting, the corporate officers explained that when lunches for providers exceeded $25 per person or dinners exceeded $100 per

23

person, the sales representatives were required to "make the paperwork work." This reinforced the practice Relator was directed by his manager to follow which involved listing fake names, usually first names of non-existent females or of real females who had not actually attended, to appear to an auditor of the paperwork that nurses had attended and that the per person dollars spent for the lunch or dinner were within the required range. From the national stage, the national officers also directed sales representatives to include in the paperwork anyone who cancelled and did not actually appear at the event.

67.     The national officers gave the same directive to all Forest Pharma sales representatives nationally during the National Savella Launch Meeting in 2009 that Relator also attended along with all other Forest Pharma sales representatives in the country.

68.     On August 22, 2011 through August 25, 2011, Relator participated at the "Branded Launch" of Viibryd and Dalisrep in Anaheim, California during which Forest Pharma's national officers directed sales representatives how to operate their "Pay-to-Play" scheme in the same manner as set forth above. Again, at a national Viibryd sales meeting March 5 through 8, 2012 in Dallas, Texas, with the corporate sales and marketing officers and all sales representatives in the county, Forest Pharma's sales and marketing officers reiterated the same "Pay-to-Play" scheme as set forth above.

69.     In the course of his employment with Forest, Relator had regular interaction with other Forest Pharmaceutical Sales Representatives who marketed all Forest drugs throughout the 50 states. He had particularly frequent and regular calls and work discussions with regard to the "Pay-to-Play" strategies with Forest Pharmaceutical Sales Representatives who promoted and marketed the same drugs as Relator did: Savella, Bystolic, Namenda and Viibryd. Relator also centrally trained with Forest

24

Pharmaceuticals Sales Representatives from throughout the country as part of his initial and periodic training on those drugs.

70. In the course of his employment with Forest, Relator was provided with various reports which identified the providers who were paid as speakers. Such reports identified the speakers as a "general speaker" or as a "thought leader," the latter meant speakers who were high volume prescribers of Forests' drugs. In 2008 Relator received a report of the 100 nationwide top prescribers of Bystolic, sent to him because it included one of the providers he worked with and had engaged as a speaker, **Dr. Alfred L. Neuhoff** in Stevens Point, Wisconsin. Relator reviewed Forest Pharmaceutical data showing that Medicare and Wisconsin Medicaid paid for Forest drugs prescribed by **Dr. Alfred L. Neuhoff.**

71. Also for example, the speaker providers are listed in an excel report titled "State Speaker Re-Contracting Report" dated January 13, 2012. All providers on the list had signed a contract with Forest agreeing to speak and had submitted a W-9. One hundred and fifty-seven (157) providers were therein listed as speakers including ten from Wisconsin who are: **Albino-Rodriguez, Juan; Burgarino, Joseph; Grimm, Suzanne; Kafa, Ammar; Soforo, Ekaterina; Tapp, Cheryl; Turbett, Timothy; Wallhaus, Thomas; Winston, Jay; and Winston, James.** Relator knows based on the reports he viewed that all Wisconsin speakers had Medicare and Medicaid patients for whom they prescribed the Forest drugs at issue in this case. Further based on reports viewed while an employee, Relator knows that every speaker for which he created an event, prescribed for patients whose prescriptions were covered by Medicare and Medicaid.

72. Relator and the other Sales representatives were told when attending National, Regional, and Area meetings and during conference calls with their local

25

managers that they should target providers for speakers who had high volumes of Medicare and Medicaid patients. Forest valued prescriptions as shown by its reference to these in the Managed Care Organization (MCO) "Sweet Spots" because these prescriptions had higher profit margins for Forest. Sales Reps could identify these providers in a Forest Pharma provided Quick Qlik Data report showing the entity paying the prescriptions and thus they could identify the volume of prescriptions paid through state Medicaid programs. Forest Pharma told its Sales Reps to tell the providers that Medicaid patients did not require prior authorization for the drugs and they were on the Medicaid approved list so the patient only needed to pay $3 copay in contrast to private insurance, with higher copays. Relator recalls only one year when Bystolic was not on the list. Forest made a higher profit as the government did not negotiate the price for the drugs unlike private insurers who negotiated discounts.

73.     On March 5, 2012 through March 8, 2012, Defendants conducted a National Sales Meeting in Dallas, Texas including sales representatives from Areas 3 and 5. Relator's Area 3 included the following states: Louisiana, Texas, Wisconsin, Illinois, Indiana, Iowa, and Minnesota.

74.     At the National Sales Meetings, Forest Pharma creates "plans of attack" ("POAs") to leverage the budgeted dollars to induce the "Targets" (prescribers) to write more prescriptions of Forest Labs' drugs.

75.     In turn each Region, then division, then territory specifically went over the prescription data purchased by Forest Pharma to determine the best kickback strategies with each target prescriber in order to obtain the best "Return on Investment" by ensuring that the case paid out resulted in increased prescription activity.

26

**B.      Kickbacks for Access & Prescription Activity**

76.      To gain access to providers, Forest Pharma representatives had to provide the compensation demanded by each provider.

77.      Every week Relator went to Walmart and purchased about 50 large bags of M & M's required for threshold entry in many provider officers.  No M & M's meant no access to certain providers.  Every day, Relator went to Starbucks and obtained the precise orders providers required to allow Relator access to them to discuss Forest drugs. **Dr. Anna Cothran**, for example, would say, "Write it down" to assure he brought her and her staff the exact type of Starbucks coffee drinks they specified.  No coffee meant no access to **Dr. Anna Cothran.**

78.      Some providers had much higher access fees than others.  For example, **Dr. Mossadiq Jaffri** required that Forest Pharma representatives provide a full lunch to his entire staff every week.   The Forest Pharma representatives, a team of five, took turns providing this bribe.  On September 16, 2011, for example, Relator arranged a catered lunch from Uptown catering for **Dr. Mossadiq Jaffri's** entire office of 15 additional nurses and other staff, as **Dr. Mossadiq Jaffri** required. In exchange for bringing a lunch, the Sales Rep could talk to Dr. Jaffri about prescribing Forest drugs. If a lunch was not brought, Dr. Jaffri would refuse to see the Sales Rep. No access without offered kickback was true of other providers as well.

79.      Relator worked in tandem with his sales partner who was also required to and did provide the same types of kickbacks as Relator.  As an example, when Relator returned from vacation on Tuesday, September 6, 2011, his next two weeks included the following bribes for prescriptions and access.  On Wednesday, September 7, 2011, Relator had to set up a luncheon for **Dr. Shmuel Mandelbaum**, a psychiatrist in

Manitowoc, Wisconsin, and Glenda McConnell, a Nurse Practitioner, with a private lunch, including 20 of **Dr. Schmuel Mandelbaum**'s staff. On Thursday, September 8, 2011, Relator set up lunch for **Dr. Jeremy Scarlett**, a pain management doctor in Sheboygan, Wisconsin, and 20 others, some of whom were actually at the lunch and others were phantoms, listed to "make the paperwork work" so the expense would not exceed the $25 per person limit. The same day, he also had to set up a lunch for **Dr. Todd Bradshaw**, a family practice doctor in Berlin, Wisconsin.

80. On Monday, September 12, 2011, Relator paid for lunch with **Dr. Dilip Tannan**, a family practice doctor in Oshkosh, Wisconsin. On Tuesday, September 13, 2011, he paid for lunch with **Dr. Chayapathy Jollu**, a psychiatrist in Appleton, Wisconsin. On Wednesday, September 14, 2011, Relator arranged for a lunch with Dr. Carroll in his office, again catered by Uptown catering. On Thursday, September 13, 2011, Relator arranged and paid for lunch with **Dr. Suzanne Beth Grimm.** As described above, on Friday, September 16, 2011, Relator provided the regular catered lunch for **Dr. Mossadiq Jaffri** and 15 others in her office, real or phantom, so that "the paperwork worked" to cover the approximately $400 cost of the event.

81. The kickbacks described in the preceding two paragraphs, are typical for a 9-business day work period in Relator's experience. In addition, during that period, he provided numerous snacks and breakfasts for other providers in his territory as a condition of access.

82. Relator received bonuses and awards for his Pay-to-Play success if he reached the targeted number of increased numbers of prescriptions written by the providers as tracked by the reports of the total prescriptions TRx written as compared to prior quarter. Sales Reps were required to review weekly the prescription activity for the

28

doctors they paid or otherwise compensated. Other Forest Pharma sales representatives throughout the country received such bonuses and awards on their Pay-to-Play results and in comparison to the results they demonstrated in the national ranking.

83. In addition, sales representatives, like Relator, who monitored "Return on Investment" and regularly discussed prescription writing volume with kickback recipient prescribers, were not bound by their set budgets per drug. Instead, such sales representatives, including Relator, were given *unlimited kickback budgets*. With each of these prescribers Relator saw in the data Forest supplied that their patients filled prescriptions paid for by Medicare and Medicaid. Based on communications from management during meeting and conference calls, Relator knew to target speakers to increase the market share of government paid prescriptions.

## C. Direct Payment Kickbacks for Speaker Events

84. Education was not the focus or even a consideration in the speaker reward events. Sales representatives were not asked for nor did they provide Forest with information regarding the content, length, or materials of any "speech" for a speaker reward event, other than the identity of the Forest drug for the announcement. Forest maintained a payment limitation of $100,000.00 per year, per provider, per drug for its speaker reward direct payments. However, this cap did not include payments for lodging, travel, lavish meals and liquor, limousine rides, or anything else that was part of the speaking event. It also did not include hosting of the provider's staff at these meals and/or other lunches in the provider's office, as a benefit to the provider's employees, all of which were charged to the respective sales representative's Forest company American Express card.

29

85.     Forest sales representatives submit approved speaker reward events to the Forest Speaker Bureau through the internet portal MYeMMaFRX (http://www.myemmafrx.com/ ), an electronic meeting management system ("eMMa") that tracks the details of Forest "promotional speaker programs".

86.     Once the Forest sales representative enters the speaker reward event into the eMMA system, the software then generates invitations for the sales representative to hand deliver. It also generates the confirmation letter, which includes the reward payment amount of $1,000.00 or $1,250.00 for local speakers or $1,750.00, for national speakers addressed to the participating provider. It also generates a "PRF" number to track each speaker reward event, which coordinated with the sales representative's bonus information.

87.     Some national speakers would be paid for three meal events daily for two days, so that, in addition to transportation, lodging, and lavish meals and drinks, they would be directly paid for 6 events at the $1,750 rate, for a total payment on investment of $10,500, contributing to the potential pay of $100,000.00 per year per drug from Forest. Some national speakers spoke on several drugs. For example, Dr. Richard Brittingham of Oklahoma spoke on five drugs Lexapro, Namenda, Savella, Viibryd and Bystolic; Dr. James Woods of Tennessee spoke on Lexapro, Namenda, Savella and Viibryd; and Dr. David Kavtaradze, of Georgia spoke on Namenda, Bystolic and Daliresp. The Sales reps referred to all three of these doctors as "speaker whores" due to the high compensation paid to them. Forest had at least one "speaker whore" from every state. Dr. Wells was one from Wisconsin.

88. Relator and all other Pharmaceutical Sales Representatives were paid a small base salary plus bonuses based on the total number of assigned Forest drugs purchased in the representative's territory.

89. For example, on August 17, 2010, Jessie Edwards, Relator's manager, sent an email to all of his sales representatives, showing their individual ranking per drug for Namenda, Savella and Bystolic in comparison to all other sales representatives throughout the United States and emphasized the requirement to use the entire allocated budget for speaker fees to increase sales so the funds would not be shifted another area.

### D. Defendants' Knowing Violation of Federal and State Anti-Kickback Statutes

90. Defendants' explained clearly to its Sales Force that doctors who wrote a high level of prescriptions of Forest drugs would be paid handsomely and that those who did not write significant Forest drug prescriptions would not be paid. To accomplish the pay to prescribe scheme, Forest used the National Speaker Bureau Program as a guise for the kickback payments.

91. Defendants maintained several company-wide schemes to provide kickbacks to providers for writing prescriptions of Forest drugs all designed to increase prescriptions for Forest drugs by providing or withholding compensation for so doing by 1) making payments for phantom presentations; 2) falsifying documents to show false attendance participation by prescribers and others and by falsifying the credentials of attendees; 3) considering as speakers only doctors who prescribe in the 7th, but generally only the 8-10[th] decile for Forest drugs; 4) terminating speakers from the

31

speaker program if they fail to increase or at least maintain the number of prescriptions for Forest drugs; 5) providing compensation of lavish dinners and drinks for doctor and doctors' staff by having the doctor post-sign to falsify his/her presence at a presentation his/her staff attended as a benefit of working for that doctor; and 6) requiring its sales force to actively track provider prescriptions as a basis for determining entry to or expulsion from the speaker award program.

92. Forest Pharma directed its Pharmaceutical Sales Representatives throughout the country to "maximize the return on investment" Forest had in its speaker fees, meals, drinks, travel, hotel, cars and drivers, and other payments and expenses Forest made to physicians through the vehicle of the corporate speaker reward program by rewarding the high prescribers and incentivizing high potential prescribers.

93. The term "return on investment" or "ROI" was used as a euphemism for the requirement that prescribers had to "Pay-to-Play" or prescribe the drug at issue in order to be eligible for the sham speaker fees.

94. Forest Management made it very clear to its Sales Force the purpose of the Forest "Speaker Program" was not education about the Forest drugs, but to reward high prescribers and, in some case, to incentivize lesser prescribers with high prescriber potential, all so that speaker program rewards or the withholding of the rewards would influence the providers' decisions about writing prescriptions of Forest drugs and increase sales of Forest drugs resulting from such kickbacks, including those prescriptions submitted to and paid for by government health insurance programs.

95. Instead of recruiting speakers and consultants based on their experience or credentials, Defendants targeted physicians based on their actual and potential prescription writing volume and willingness to participate.

96.     The sham nature of the speaker events was apparent from the attendees, speakers, subject matter and venues. To hide its kickbacks, Forest Pharma required its sales representatives to falsify the documents and "make the paperwork work" by entering names of phantom attendees---either fake names or the names of persons who were real, but had not actually attended the event.

97.     Frequently there were few or no prescribing attendees or the attendees would be other speakers, or just spouses or administrative office staff who would be falsely designated as nurses.  In some cases the events never actually took place at all; nevertheless the designated "speakers" were compensated for the phantom events.

98.     The local speakers had no special expertise in the drugs about which they were to speak and, in fact, no real educational program was presented at all.  It was common for no slides to be shown at all.

99.     Almost universally the venues for these events were not conducive to education, but were selected as a reward for the prescribing speaker, with lavish food and drink.

E.      **Forests' Payments to Physicians Were Tied to Their Prescription Activity, Not their Speaker Qualifications.**

      **1. Forest Created a National System for Tracking Physicians' Weekly Prescriptions & Required All of Its Pharmaceutical Sales Representatives to Base Speaker Payments on Prescription Volume.**

100.    In order to induce physicians to prescribe and recommend the prescription drugs Forest was peddling, Forest Pharma paid kickbacks to healthcare professionals in various forms, including speaking fees, travel, entertainment, travel, lodging, and lavish food and drink.  These payments induced physicians to prescribe

Case 2:12-cv-00366-WED   Filed 02/05/16   Page 33 of 97   Document 67

Forests' products, including but not limited to Bystolic, Savella, and Namenda and to maintain high levels of such prescription activity.

101.    At a corporate level, Forest Pharma's national Speakers Bureau and other Sales and Marketing officials, created a budget, software, and other tools and policy to require an analysis of Forest Pharma's Return on Investment to determine how much the bribed prescribers were prescribing of the drug they were bribed to prescribe.

102.    Each Forest Pharmaceutical Sales Representative was required to spend *at least* all of the money allotted to them for such events, as well as for breakfast and lunches in physician offices.  The Pharmaceutical Sales Representatives were instructed that if they spent all of the allotted funds, they would receive more and, that if they did not spend all of their allotted funds on the doctors, then those Pharmaceutical Sales Representatives would be disciplined.

103.    In order to track the "Return on Investment" it was receiving for these said inducement payments, Forest purchased the prescription records of all physicians in the country.

104.    Despite the national directive to refrain from references to "Pay-to-Play" in voicemails, emails or call notes following a call on a doctor, management occasionally got sloppy, such as:

> a) Team, I've released budgets for Q1 and I need each of you to go into the Financial Reporting System to take a look at the budget that you have *earned* for this quarter (make sure you also "accept" your allocations)!  Unique budget amounts are allotted to each of you based on your sales results, your utilization of this resource and the communication or follow-up that I hear on how you grow TRX with this resource.  Make no mistake about it, we have a tremendous amount of dollars at our disposal!  However, as a tool to grow TRX – budgets are only as good as our daily planning, prioritization and execution.

34

Let's keep 3 key pearls in mind:

- Coding Diligence - we've all discussed how we're going to "code" our Expenses moving forward to ensure that we maximize our budgets for each product.

0. The Mix for your Coding:

1. SV: Unless it's a Program – these dollars should only be reserved for Pain Specialists, Physiatrists, Neurologists or Rheumatologists who are ONLY SV Targets

2. BYS: <u>I need each of you to code as many daily scenarios as possible under BYS.</u>  Primary Care Lunches/Appointments/Breakfasts/Displays/Office Snacks should be nearly exclusively coded to BYS. ….WI, 5/4/2011

b)Team, I've released budgets for Q4!  We've talked live about your budget spend in Q3, your actions for utilizing this resource to grow TRX in Q4 and I need each of you to go into the Financial Reporting System to take a look at the budget that you have <u>*earned*</u> for this quarter.  Unique budget amounts are allotted based on your sales results, your utilization of this resource and we have a tremendous amount of dollars at our disposal!  However, as a tool to grow TRX – <u>budgets are only as good as our daily planning, prioritization and execution.</u>

Let's keep 3 key pearls in mind:

- Coding Diligence - we've all discussed how we're going to "code" our Expenses moving forward to ensure that we maximize our budgets for each product.

The Mix for your Coding:

1. VB: <u>Unless it's a Program</u> – these dollars should only be used for Psychiatrists and Mental Health NPs or PAs

2. SV: <u>Unless it's a Program</u> – these dollars should only be reserved for Pain Specialists, Neurologists or Rheumatologists who are ONLY SV Targets

3. BYS: <u>I need each of you to code as many daily scenarios as possible under BYS.</u>  Primary Care Lunches/Appointments/Breakfasts/Displays/Office Snacks should be nearly exclusively coded to BYS where this is a P1, P2 or P3. …WI, 1/30/2012

35

### 2. On a Corporate Level, Forest Pharma Assured the Speaker Payments Were Tied to Prescription Volume of Forest Drugs.

105.    Forest Pharma's corporate office required on a nation-wide basis that doctors who prescribed a high volume of Forest Labs' drugs were paid high speaker fees.

106.    The connection between prescription volume of Forest drugs to payments and other compensation to the doctors from Forest Pharma was glaring.  For example, for 2008, *all* of the top 20 Bystolic prescribers were Forest speakers and all received huge sums for direct speaker "events" payments.

107.    To peddle the new Bystolic drug into that market, Forest Pharma had to flood physician offices with a nation-wide sales force with budgets sufficient to wine and dine the doctors; provide breakfasts, lunches, snacks and dinners to their staffs, and to arrange for direct payments to doctors for their speaker "events", that were often shams and used merely to funnel payments to the prescribing doctors. Forest Pharma's national Sales & Marketing officials required their Pharmaceutical Sales Representatives throughout the country to pay the highest prescribers as much as possible to assure they received the cap of $100,000 per year per drug.

108.    About 50% of such speaker "events" were shams, with little or no education content, no prescribing attendees or only one attendee, often a friend of the "speaker", and/or in lavish entertainment venues not conducive to or intended for education events.

109.    Forest Pharma's Sales & Marketing Department paid for physician prescription activity data and ranked all prescribers in the United States based upon the prescription volume of Forest Lab's drugs, shared that information with its sales force, and required all of its sales representatives to plan their budgets to reward or punish

36

based on prescription volume. In conveying this information, Forest used TRx to mean total number of prescriptions written.

110.    For example, Forest Pharma's 2008 physician rankings for Bystolic included the following:

| Bystolic - Top Prescribers LTD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TRx | | | | | | | | ACTUAL (LTD) | |
| RANK | FID | PRESCRIBER | SPEC | CITY | ST | Zip | BY Share | BY TRX's | Total BB TRX's |
| 7 | 200007581271 | BRITTINGHAM, RICHARD | IM | LAWTON | OK | 73505 | 27.50 | 352 | 1281 |
| 14 | 200001117583 | KAVTARADZE, DAVID | IM | CORDELE | GA | 31015 | 12.71 | 273 | 2148 |
| 95 | 200007567741 | NEUHOFF, ALFRED | FM | STEVENS POINT | WI | 54481 | 18.21 | 121 | 664 |

111.    **Dr. Richard Brittingham** in Lawton, Oklahoma was the 7th highest prescriber of Bystolic in the United States.  Forest rewarded him with speaker kickback payments by requiring its sales representatives throughout the country to arrange for speaker payments to him.  By 2012, Forest was paying **Dr. Richard Brittingham** as a national speaker for events throughout the United States for five (5) of Forest Labs' drugs, exponentially increasing his speaker payment caps, as his maximum was then increased from $100,000 to $500,000.

112.    Forest Pharma's Sales & Marketing staff required Relator as well as all other sales representatives nationally to arrange speaker "events", often merely as a guise to make the direct bribes to the doctors.  For example, Relator's managers required him to arrange such events for **Dr. Alfred Neuhoff** in Stevens Point, Wisconsin as well as for other national speakers such as **Dr. Richard Brittingham** and told him that his failure to do so would not only reduce his compensation, but could end his employment with Forest Pharma altogether.  Forest Area Sales Manager Jessie

37

Edwards directed Relator in this manner based on corporate policy on a continuous basis, including but not limited to via emails on January 13, 2008 and January 19, 2008.

113.    On August 28, 2008, the United States Food & Drug Administration ("FDA") sent an official "WARNING" letter to Forest's then Chief Executive Officer, Howard Solomon, rebuking Forest for referencing Bystolic as "superior" and "novel" as there was no basis that Bystolic was in fact either "novel" or "superior" over the generic.

114.    Consequently, bribes were necessary to obtain the rapidly increasing Bystolic prescriptions, most paid for by the United States and the individual named states.  The speaker payments and other compensation were very effective to obtain physician prescriptions of Bystolic.  By 2012, Forest's sales of Bystolic reached $348 million dollars, nearly double that of 2010. Many of these prescribers had financial ties to Forest Pharma.  This is particularly striking given the fact that as of 2008, Bystolic cost about $80 monthly, while Costco sold the generic counter-part for only about $10 monthly.

   **F.  Throughout the Country All Forest Pharmaceutical Representatives Followed the "Pay-to Play" Scheme at the Boots on the Ground Level with the Physicians Whose Prescription Activity they Closely Tracked to Assure a "Return on Investment".**

115.    As a condition of employment, Forest required all of its Pharmaceutical Sales Representatives to review the prescription activity of all of the physicians in their territory and to arrange payments to target those with high prescription potential. In addition, management required Pharmaceutical Sales Representatives to drop as paid speakers the physicians whose prescription activity did not increase or if it declined.

38

116.     Forest sales representatives, such as Relator, were required to arrange six (6) to nine (9) "speaker programs" quarterly in order to avoid financial and job security penalties with regard to their employment.

117.     Kroening's manager, Jessie Edwards, was adamant about frequent speaker reward events programs in keeping with the directives from the national officers who addressed the national launch meetings.  He emphasized the need for paying "speakers" and to assure that the chosen "speakers" were writing enough prescriptions of Forest drugs so the Defendants would get a "return on investment" of the expense of the speaker reward payments and lavish meal and liquor expenses.

**Dr. Emilio C. Gatti**

118.     On January 6, 2010, Edwards wrote to the area Pharmaceutical Sales Representatives about **Dr. Emilio C. Gatti**, a newly developed "speaker" who wrote his first prescription of a Forest drug in conjunction with his first payment from Forest.

119.     By September 10, 2010, Forest Pharma rated **Dr. Emilio C. Gatti** as an "A Target" with a "Value Rating" of 8 on Savella and he was the top Savella prescriber in the Oshkosh territory, increasing his Savella prescriptions from 9 to 27 quarter over quarter, according to the prescription data Forest Pharma provided to Relator and required him to review.

**Dr. Cheryl Tapp**

120.     **Dr. Cheryl Tapp** was an "A Target" prescriber for Forest products Namenda and Savella.  Forest Pharma's corporate office rated **Dr. Cheryl Tapp** as Decile 10/10.

39

121.    By January 14, 2009, Forest Pharma issued a report listing **Dr. Cheryl Tapp** as one of the 5 top speakers in Relator's territory and one of the 3 top speakers for Namenda in the territory, based on her prescription volume.

122.    Relator personally reviewed the data provided to him by Forest Pharma weekly, setting out **Dr. Cheryl Tapp's** prescription history for the week, the quarter to date, and the prior quarter for each Forest drug. **Dr. Cheryl Tapp** increased the prescriptions for Forest Pharma products Namenda and Savella each time she was paid for a speaker event. Relator also reviewed **Dr. Cheryl Tapp's** speaker event payment record which indicated that Forest Pharma paid checks directly to **Dr. Cheryl Tapp** in the amount of between $3,000 and $5,000 per quarter.

123.    During a June 20, 2012 ride-along with Relator, Forest manager Jessie Edwards instructed Relator to coach **Dr. Cheryl Tapp** to sell Viibryd more effectively. Edwards was concerned about Forest's "return on investment" since Dr. Tapp was in the speaker reward program and Forest was thus tracking her prescription volume. Edwards told Relator, "We are paying her [Dr. Tapp] to speak on Viibryd and she has only written three prescriptions. If she is not prescribing the medication, how can we pay her to speak on it? If you don't coach her on how to sell Viibryd we will no longer pay her to speak." Edwards told Relator that he "needs to have backbone" when speaking to Dr. Tapp about the relationship between the speaker reward and writing prescriptions. When Relator expressed reluctance to tie in the pay to play, Edwards told him, "I guess you don't want to win as bad as the rest of the nation." On July 16, 2012, Dr. Tapp was a "speaker", and although two other attendees were listed as in attendance, no one had actually attended. Nevertheless, Forest paid **Dr. Cheryl Tapp** $1,000 directly for the

40

July 16, 2012 event. Forest also paid **Dr. Cheryl Tapp** $1,200 for speaking July 25, 2012 for Viibryd at the Fond Du Lac County Building.

124.    Dr. Tapp also spoke on Namenda for Relator from 2007 to 2012, often with no educational content and occasionally without prescribing attendees and she was always paid.

125.    Pharmaceutical Sales Representatives' performance ratings, raises, bonuses, and job security were based, in part, on speaker reward activity. High performance ratings for sales representatives were based on the number of speaker reward events they scheduled and the amount of money paid directly to providers as speaker awards as well as the more lavish events staged as evidenced by the funds each sales Representative spent for the providers.

126.    To facilitate providing these kickbacks to physicians, sales representatives were usually given at least $12,000 as a quarterly budget. Relator was regularly approved for a quarterly budget in excess of $12,000 and up to $26,000 monthly to bring speakers in. He was required to submit his requests for approval of the speakers and was never denied, unless the speaker was not writing enough prescriptions.

127.    In addition, Pharmaceutical Sales Representatives were encouraged to go over their budget in order to reward physicians who were actively increasing their Forest drug prescriptions, such as Dr. Jollu, as set out in Jessie Edwards' February 21, 2011 email:

> **From:** Edwards, Jessie
> **Sent:** Monday, February 21, 2011 11:49 AM
> **To:** Kropp, Katie
> **Cc:** Kroening, Kurt; Jensen, Brad; Volpe, Jeffrey
> **Subject:** FW: Budgeting SV

41

Good Afternoon!

Katie, you can speak with Intramed and move these over to the SV
budget for Kurt or Brad – thanks!

Jessie L. Edwards
Divisional Manager (Therapeutics/Ethicare)
Eastern Wisconsin & the UP of Michigan
(O): 1.888.430.5227 x52120000
(C): 920.918.0799
jessie.edwards@frx.com

"The successful person has developed the habit of doing the things
unsuccessful people do not do"

---

**From:** Kropp, Katie
**Sent:** Monday, February 21, 2011 9:06 AM
**To:** Kroening, Kurt; Jensen, Brad; Edwards, Jessie
**Cc:** Volpe, Jeffrey
**Subject:** Budgeting SV

Hello Gentlemen,

   Although I entered these programs into the system already are either
of you able to pick up the budgeting for the programs for:

1. Dr. Jollu Lunch Program taking place February 22nd (tomorrow)
   with Williams Clinic in Green Lake
2. Dr. Jollu Lunch Program taking place March 22nd with Nelsen and
   Iverson's Clinic in Ripon
………
Katie

128.    Forest placed no importance whatsoever for purposes of employee review

on the number of attendees at the reward events or the educational content or actual

"speech" or "program".  Rather, the emphasis for performance purposes, was on whether

the sales representative could "make the paperwork work" and achieve a ROI as

evidenced by prescription volume. If sales representatives did not schedule sufficient

speaker programs, their field ride evaluations would be poor, indicating that the sales

representatives were lazy and not spending the money that Forest provided for

42

kickbacks. The result could mean loss of a bonus, raise and/or being placed on a Performance Improvement Plan.

129. The first step in the "Speaker Program" for the sales representatives is to review the prescription rates for each of the providers in the respective sales representative's territory in Forest's Quick Qlik software system for Forest drugs and competing products. Defendants purchase prescription data from Walgreens, CVS and others to produce and provide to its sales representatives, such as Relator, Quick Qlik software reports to show which drugs providers prescribe on a weekly basis, including drugs competitive to Forest products. Generally sales representatives are restricted to using providers for speakers who are in the 8th to 10th decile, and sometimes in the 7th decile, for writing prescriptions for Forest drugs.

130. Defendants target providers with a high number of Medicare and/or Medicaid patients for its speaker reward events. The sales force could identify those providers because Defendants produce internal reports using Plan Track software that lists the percentage of each provider's patients who are beneficiaries of Medicare, Medicaid, or private insurance patients and what percentage of patients were being prescribed specific drugs. This report is used by sales representatives to target specific providers, for example to focus on use and potential use of Forest drugs designated as "preferred" for Medicaid and/or Medicare, leading to special pricing for beneficiaries and allowing a marketing point to push additional drug sales to beneficiaries of government programs with designated "preferred" drugs. The report shows that Forest knew the speaker physicians were writing prescriptions for drugs paid upon submission of claims to the government programs for payment of the drugs detailed in the report.

43

131.     As an example of Edwards directing the Sales Reps to target prescribers of Medicare and Medicaid, he stated in an email to Kroening and others:

> ----For Call-ins this week – I want you to be prepared to SPECIFICALLY answer the questions below! Who are your huge State Medicaid Physicians?

Sent by Edwards on August 9, 2010

> From a messaging standpoint, you should use the "funnel approach" (just like you would with any PBM opportunity).  Always start with the largest opportunities at the physician level (i.e. Medicaid, Humana, United Part-D etc)…

Sent by Edwards on January 4, 2011, Wisconsin

132.     The following is a sample of claims submitted and paid for by three of the state Medicaid programs from 2008 to 2013 by providers who were general speakers. Of course, the dollars were much higher, because the data below does not include private insurance and personal payments for the drugs but is confined to government payments.

| DRUG | ST | State License Number | Presc Ord Prov NPI | Presc Ord Prov Name | Claims | TOTAL MEDICAID PAID | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|------|----|----|----|----|----|----|----|----|----|----|----|----|
| BYSTOLIC | NY | 190663 | 1790714962 | GORIS, JOSE ARMANDO MD | 390 | $20,338 | $95 | $1,953 | $4,531 | $7,725 | $2,842 | $3,191 |
| BYSTOLIC | NY | 205707 | 1508890740 | MUSTER, SIMA MD | 359 | $17,538 | $417 | $1,806 | $3,880 | $5,472 | $2,869 | $3,095 |
| NAMENDA | NY | 205063 | 1558334961 | COHEN, BRADLEY J MD | 110 | $18,071 | $2,160 | $4,028 | $1,850 | $2,867 | $1,553 | $5,613 |
| NAMENDA | NY | 230972 | 1710924964 | ZITSER, GENE MD | 231 | $35,880 | $2,021 | $2,707 | $5,695 | $6,536 | $8,714 | $10,208 |
| NAMENDA | T | G5833 | 1780615732 | IGOA, JOSE | 503 | $112,686 | $17,987 | $18,075 | $29,298 | $26,870 | $20,456 | $0 |
| NAMENDA | T | J6591 | 1821277708 | MEHRA, VIRAM | 254 | $45,076 | $742 | $6,694 | $7,424 | $27,041 | $3,174 | |
| SAVELLA | NY | 186529 | 1093751919 | BALMACEDA, CASILDA MD | 594 | $64,514 | $0 | $8,482 | $22,798 | $19,784 | $9,859 | $3,601 |
| SAVELLA | NY | 230972 | 1710924964 | ZITSER, GENE MD | 332 | $34,028 | $0 | $2,797 | $10,585 | $9,317 | $5,903 | $5,426 |
| SAVELLA | WI | 52056 | 1700077054 | SOFORO, EKATERINA V | 280 | $32,488 | $0 | $2,517 | $14,456 | $10,716 | $1,649 | $3,150 |
| | | | | | 3053 | $380,619 | $23,422 | $49,059 | $100,517 | $116,328 | $57,019 | $34,284 |

133.     Plan Track also revealed how many prescriptions the provider is writing for competitor drugs. Plan Track's tabulations treat off-label use prescriptions the same as those on label. Defendants' sales representatives use these reports to target specific physicians for the speaker rewards program who are not high

44

prescribers of Forest's drugs to encourage them to prescribe Defendants' products over those of Forest's competitors.

134.    Defendants pressure their sales representatives to obtain commitments from physicians to write prescriptions for Defendants' drugs by providing the physicians with kickbacks in the form of pay for "speaking" engagements and also for lavish dinners for the provider and sometimes the provider's staff. Relator's manager, Jessie Edwards, directed Relator to show the prescription reports to his providers, but Edwards added to the directive that "in a court of law I am going to deny this."

135.    Once the sales representative plans a speaker reward event, he or she goes to his or her manager for approval. Relator had his planned reward events denied if the prescribing provider did not have a high prescription rate of Forest drugs or if the prescriber lacked a high potential due to its patient population. The approval for a provider to be included in the Forest speaker reward program was made ultimately by the "Physician Validation Group" headed in 2009 by Joe Zimmerman in the Forest Laboratories' compliance Department.

136.    For the highest prescribers, such as Dr. Alvin Wells who wrote the most Forest prescriptions in Wisconsin, Forest elevated them to national speaker status.  Dr. Wells then was regularly paid for both a lunch and dinner event, although it was agreed that he would not actually have to appear at any lunch event.

137.    For lesser prescribers, the sales representatives were required to "cultivate" them into speakers, not based on their knowledge, but in order to turn them into high prescribers by arranging direct payments and other compensation. Such compensation began with the access payments including snacks, coffee, breakfasts, staff

45

lunches and so on. Then the doctors were "cultivated" with training at upscale hotel venues, such as the Omni Mandalay Hotel in Irving, Texas, where Forest Pharmaceuticals sent speakers from the northern states on January 15th and 16th, 2009. Finally, doctors were "cultivated" with direct speaker payments, including for sham "events".

138. At the direction of Defendants, Relator primarily held speaker reward events at upscale restaurants serving lavish dinners and drinks including: (1) Cucina (Kohler, WI); (2) Courthouse Pub (Manitowoc, WI); (3) Beckett's (Oshkosh, WI); (4) Sebastian's (Fond du Lac, WI); (5) Black Wolf Run (Kohler, WI); (5) Chop House (Sheboygan, WI); (7) Steffano's (Sheboygan, WI); (8) Mo's Steakhouse (Milwaukee, WI); (9) Mr. B's (Milwaukee, WI); (10) Poplar Inn (West Bend); and (11) Lake Park Bistro (Milwaukee, WI).

139. During or about 2010 and before January 2011, Forest tightened its policies, but not its practices, for its speaker reward program, to require two provider attendees at speaker reward events. Specifically by way of example, Relator's manager, Jessie Edwards told Relator, "Nothing's changed; we just have to get more paperwork". Maintaining paperwork to comply with the policies while retaining the same practices required falsification of Speaker Program Attendee Sign-In Sheets. If insufficient attendees were present, Forest managers directed their sales representatives to add individuals who were not present or whose credentials were not as represented. Common directives from management when there were not sufficient attendees to meet policies were to "improvise" or to "add in more names and we are good to go". While this had long been the required practice, it became more important during 2010 and going forward because of the increased requirements.

46

140.    In accordance with the directives from the national officers, Relator arranged speaker kickbacks including but not at all limited to the examples below.

**Dr. Alvin F. Wells**

141.    Forest rated **Dr. Alvin F. Wells** as an A Target because he was in the 10/10 Decile for his Savella prescriptions, as the highest Savella prescriber in Wisconsin.

142.    As required of him by Forest Pharma, Relator reviewed **Dr. Alvin F. Wells**' prescription data on a weekly basis.  Forest's data revealed that Dr. Wells increased his prescriptions after Forest paid him for speaking "events".  Recognizing on the ROI,  Edwards wrote Kroening and others an email referring to Savella stating:

> …Now, we've done a solid job with the Dr. Hess and Dr. Wells SV Speaker Programs for the month of October and we know that the optimal utilization of this resource is going to pay huge dividends.  From: Edwards, Jessie
>
> Sent: Tuesday, April 28, 2009 11:23 AM

143.    In 2010, Relator arranged a luncheon and dinner that was scheduled to feature **Dr. Alvin F. Wells** as a speaker at both events. Dr. Wells was to be paid $2,500 for the events, $1,250 for lunch and $1,250 for dinner. Dr. Wells requested car service for transportation. The event was held at the Wolf River Lodge of the American Club resort in Kohler, the only 5-star lodging in the State of Wisconsin.  Forest did not expect Dr. Wells to actually speak or provide any educational content, but the company nevertheless paid Dr. Wells $1,250 for the lunch speaker "event" as well as for the lavish dinner event.  Edwards specifically directed Relator to pay Dr. Wells for both speeches

even though Relator informed Edwards that Dr. Wells did not speak or present at the luncheon session.

144.     Area Forest Pharmaceutical Sales Representatives referred to **Dr. Alvin F. Wells** as a "speaker whore" because he openly bragged about being paid for prescribing Forest drugs.  Forest Pharma paid Dr. Wells $1,000 for a phantom Savella presentation to **Dr. Dilip Tannan** in Oshkosh, Wisconsin.  Although **Dr. Alvin F. Wells** never appeared at the phantom event, Relator's manager directed him to pay **Dr. Alvin F. Wells** $1,000 for the phantom event, so that he would receive "as much as possible".

145.     Forest Pharma also paid **Dr. Alvin F. Wells** $1,500 for a speaker "event" at the Kohler American Club Whistling Straights Golf Club dinner program, although it lacked educational content. In addition, Forest required Relator to pay from his budget for a Lincoln Town car to drive **Dr. Alvin F. Wells** to Kohler, Wisconsin for the lavish evening event.

**Dr. Ekaterina Soforo**

146.     Forest rated **Dr. Ekaterina Soforo** as an "A Target" for Savella because she was in the 9/10 Decile for Savella prescriptions.  As required of him by Forest Pharma, Relator reviewed the prescription data for **Dr. Ekaterina Soforo** weekly. Forest's data revealed that **Dr. Ekaterina Soforo** increased the number of prescriptions written for Savella each time she was paid for a speaker "event".  The company's data provided to Relator also indicated that Forest paid **Dr. Ekaterina Soforo** $3,000 to $6,000 per quarter for speaker "events" related to Savella.

48

147.    Forest management encouraged and approved an event that took place on March 10, 2010 at Theo's Chop House, in Fond du Lac, Wisconsin, then one of the most highly rated and most pricey restaurants in the area. **Dr. Ekaterina Soforo** was listed as the "speaker", although there was no educational content, or other physicians besides **Dr. Ekaterina Soforo** herself.  Forest Sales Representative, Jennifer McMahon, also participated in the event, as did one of the doctor's staff, as a perk of the job. The name of a non-attendee provider was added the following day.

148.    Despite knowledge that the **Dr. Ekaterina Soforo** lavish dinner had no prescriber attendees, Forest Pharma paid her $1,250 for the event in addition to the lavish food and liquor.

**Dr. Jeffrey Junig**

149.    Forest Pharma rated **Dr. Jeffrey Junig** as an "A Target" for Viibryd because he was in Decile 8/10 for the drug.  As required of him by Forest Pharma, Relator reviewed **Dr. Jeffrey Junig's** Viibryd prescription data weekly.  This data revealed that **Dr. Jeffrey Junig** increased his Viibryd prescriptions each time Forest paid him for a speaker "event".  The company's data provided to Relator also indicated that Forest paid **Dr. Jeffrey Junig** $3,000 to $6,000 per quarter for Viibryd speaker "events.

150.    On January 19, 2012, Forest held a speaker reward event at the Oshkosh County Building for "speaker" **Dr. Jeffrey Junig** of Fond Du Lac, WI, a speaker for multiple drug companies, although there were no prescribers in attendance, building staff did enjoy a free lunch. Multiple staff did enjoy a free lunch. Pursuant to

management directive, the next day, the Sales Representative obtained signatures from non-attendees **Dr. Kurtida Ringwalla** and **Nurse Practitioner Brooke Vanevehaven**.

**Dr. Juan Albino-Rodriguez**

151.    Forest Pharma rated **Dr. Juan Albino-Rodriguez** as an "A Target" for Savella because he was in decile 9/10 for the volume of his Savella prescriptions.  As required of him by Forest Pharma, Relator reviewed **Dr. Juan Albino-Rodriguez's** prescription data weekly.  This data revealed that **Dr. Juan Albino-Rodriguez** increased his Savella prescriptions each time Forest paid him for a speaker "event".  The data also revealed that Forest paid **Dr. Juan Albino-Rodriguez** $3,000 to $12,000 per quarter, just from speaker "events" arranged by Relator himself and by Forest Pharma's Green Bay Pharmaceutical Sales Representatives.

152.    On November 10, 2011 Forest held a speaker award event program and paid "speaker" **Dr. Juan Albino-Rodriguez** of Neenah, Wisconsin $1,000.00 or 1,250.00 for "speaking" only to another Forest speaker reward program participant, **Dr. Stephen Shopbell**, of Oshkosh, WI at Dr. Shopbell's office, and without any educational content.

153.    The following day, Relator's manager, Edwards, directed Relator added in fake attendees to falsely legitimize the speaker "event".  **Dr. Juan Albino-Rodriguez'** nurse, Carissa Meyer, signed the Speaker Program Attendee Sign-In Sheet, indicating she had been in attendance at the "event" the prior day, although she had not.

**Dr. Stephen Shopbell**

154.    Forest had already rated **Dr. Stephen Shopbell** himself as an "A Target" for Viibryd because his prescription volume placed him in Forest's 10/10 Decile. As

required of him by Forest Pharma, Relator reviewed **Dr. Stephen Shopbell's** prescription data weekly. This data revealed that Dr. Shopbell increased his Viibryd prescriptions after every speaker "event" and that Forest paid him $3,000 to $6,000 quarterly for "speaking" to promote Viibryd.

**Dr. Timothy Turbett**

155. Forest Pharma rated **Dr. Timothy Turbett** as an "A Target" for Bystolic and Viibryd because he was in the 10/10 Decile for both Forest drugs. As required of him by Forest Pharma, Relator reviewed **Dr. Timothy Turbett's** prescription data weekly. This data revealed that **Dr. Timothy Turbett** increased his Bystolic and Viibryd prescriptions every time Forest paid him for a speaker "event". The data also revealed that Forest paid **Dr. Timothy Turbett** $3,000 to $12,000 per quarter for speaker "events".

156. Forest Pharmaceutical Sales Representatives regularly referred to **Dr. Timothy Turbett** as a "speaker whore" because he would omit educational content about Bystolic at his "events" and instead would state openly that he prescribed Forest drugs because he was getting paid by Forest. This encouraged other physicians to join the Forest Speakers Bureau.

157. On February 28, 2012, at a Bystolic speaker "event" on Bystolic by **Dr. Timothy Turbett** at the Poplar Inn in West Bend, Wisconsin, Dr. Turbett stated to another physician at the lavish dinner event: "I love Bystolic, but I really love my paycheck from Forest." Forest's paycheck to **Dr. Timothy Turbett** for the Poplar Inn "event" was $1,250.

**Dr. Simon Llewellyn**

158.    Forest rated **Dr. Simon Llewellyn** as an "A Target" because he was the #1 prescriber of Bystolic in the State of Louisiana.  Forest pressured its Pharmaceutical Sales Representatives to arrange speaker "events" for him to assure that he was paid the $100,000 annual cap for Bystolic every year.

**Dr. Alfred Neuhoff**

159.    Forest rated **Dr. Alfred Neuhoff** in Stevens Point, Wisconsin as an "A Target" because he was the 95th highest Bystolic prescriber in the United States.  Sales Managers Tim Tobolic and Jessie Edwards required Relator to pay **Dr. Alfred Neuhoff** **"**as much as possible" to make sure he continued to prescribe Bystolic.

160.    Relator arranged for numerous Forest Pharma payments to **Dr. Alfred Neuhoff**, often without educational conduct or prescribing attendees.  As required, Relator reviewed **Dr. Alfred Neuhoff** prescription data provided to Relator by Forest Pharma at least weekly.  **Dr. Alfred Neuhoff** continued to increase his Bystolic prescriptions following his receipt of payments from Forest.

161.    Based upon Relator's experience and the information he learned from other Forest Sales Representatives, managers and staff throughout the country, only about 50% of the Forest speaker reward events actually had any type of program content. Of those that did include any content, the talk was generally only about 5 to 10 minutes and was primarily about the other provider's practice, not specifically about a certain Forest drug. Based upon the directives at the national meetings by the national officers, there was no educational requirement for the reward events.

162.    The last step for the Forest Sales Representatives was to review the prescriptions written by the provider *after* the speaker program reward to see if the prescription levels were maintained or increased, to create an Excel spreadsheet depicting the data, and send it to their respective manager. Pursuant to the directives national officers provided at the national meetings, those providers whose prescriptions increased or, if the level was already high, if the prescription level was at least maintained, were to be continued on in the speaker reward program and, conversely, those providers whose prescriptions did not increase or in some cases at least maintained, were terminated from the speaker reward program because management would require, as they put it, a "return on investment" from the speaker reward program.

### G.  Prescriber Prescription Activity Was Tied So Closely to "Speaker" Payments, that Forest Pharma Terminated Prescribers for Speaker Payments if the Prescriber Did not Increase their Prescriptions after Such Payments.

**Dr. Suzanne Beth Grimm**

163.    Forest paid **Dr. Suzanne Beth Grimm** for speaker "events" for Namenda, but terminated her from the Speaker Bureau in 2008 based on her low level of Namenda prescriptions.   To encourage her to increase her prescriptions after her punishment hiatus from the Forest Speakers Bureau, Relator got her reapproved on July 23, 2009.

164.    Thereafter, Relator was able to arrange for Forest to pay **Dr. Suzanne Beth Grimm** $1,250 per speaker "event".  Relator initially scheduled her at least five (5) times annually for such payments related to Lexapro or Namenda and then in 2012 he scheduled her for such payments for Viibryd speaker "events".

53

165.     Throughout the country, Forest Pharma followed the same practice of punishing "speakers" who did not prescribe in a Decile 6/10 or above by removing them from speaker payments.

### H. In Addition to Bribes for Speaker "Events", Forest Pharma also Required all of its Pharmaceutical Sales Representatives to Provide Breakfasts, Snacks, and Lavish Luncheon and Dinner Food and Drinks to Prescribers in Exchange for Prescriptions of its Drugs.

166.     In addition to each Pharmaceutical Representatives sham speaker event payments to physicians, Forest Pharma provided its national sales force with many other types of perks to encourage prescriptions writing.  National policy required the sales force to code its expenditures to maximize the "soft" money for lavish food and the like and not to let those sums encroach on the budget actually allotted to pay doctors for prescribing through the sham speaker program.

167.     In his email to his sales force on May 4, 2011, Relator's area manager explained the national policy:

> "Coding Diligence - we've all discussed how we're going to "code" our Expenses moving forward to ensure that we maximize our budgets for each product.
>
> Mix for your Coding:
>
> SV: Unless it's a Program – these dollars should only be reserved for Pain Specialists, Physiatrists, Neurologists or Rheumatologists who are ONLY SV Targets
>
> BYS: I need each of you to code as many daily scenarios as possible under BYS.  Primary Care Lunches/Appointments/Breakfasts/Displays/Office Snacks"

### Dr. Kurtida Ringwalla

168.     **Dr. Kurtida Ringwalla** in Oshkosh, Wisconsin was not on the Speakers Bureau, but was an "A Target" because she prescribed in the 9/10 Decile for Bystolic,

Case 2:12-cv-00366-WED   Filed 02/05/16   Page 54 of 97   Document 67

the 8/10 Decile for Savella, and the 5/10 Decile for Namenda. Consequently, in accordance with the company's national policy, such a high prescriber non-speaker was to be paid as much as possible in compensation other than direct checks for speaker events.

169. Pursuant to Forest Pharma's national sales policy, Relator used his budget to invite **Dr. Kurtida Ringwalla** to various fake speaker events to provide her *and her husband*, who was not in the medical field, with free and lavish meals and liquor. Pursuant to directive from management, Relator's training and national policy, Forest required Relator to fabricate an attendee to pay for **Dr. Kurtida Ringwalla's** husband's lavish meal expenses as part of the reward to **Dr. Kurtida Ringwalla** for her high level of prescriptions of Bystolic, Savella and Namenda.

170. Upon information and belief, Defendants have not returned any sums of money to the United States government or the various State governments listed in this complaint as a result of false claims.

171. Many doctors used the fake speaker events to bring their colleagues to lavish lunches and dinners.

## VII. FOREST PHARMA CONSPIRED WITH THE PHYSICIANS TO CONCEAL KICKBACKS AS SPEAKER PAYMENTS IN EXCHANGE FOR INCREASED PRESCRIPTIONS OF FOREST LABS' DRUGS.

172. As detailed above, Forest Pharma trained its sales force to arrange for direct "speaker" payments to prescribers based on prescription activity. Forest Pharma intended to and often did pay these high prescribers even when it was anticipated in advance that there would not be an event at all, such as the Dr. Alvin F. Wells phantom

Case 2:12-cv-00366-WED   Filed 02/05/16   Page 55 of 97   Document 67

luncheons; or that there would be little or no educational content; or when there were no prescribing attendees.

173.     Both Forest and the speaker receiving the payment knew when these payments were made that no compensable services were provided and the purpose was a kickback for prescribing Forest Lab drugs.

174.     Forest targeted prescribers with Medicare and Medicaid based patient populations as the profit margin put them in its "sweet spot."

175.     Forest Sales Reps even had a nickname for those speakers who in particular accepted high speaker payments in exchange for prescribing high volumes of Forest drugs and who accepted payments when no one was in attendance with prescribing privileges and who accepted payments when no event occurred. They were called speaker whores.

176.     The speaker program could not have generated a satisfactory ROI for Forest without the participation of the speakers.

177.     The participants knew the goal of the impermissible kickbacks was to increase the volume of prescriptions written for Forest drugs and that included those paid for through government programs.

178.     The speakers while not named as defendants are co-conspirators with Forest and none reported the illegal kickbacks to the government and all knew the prescriptions written for patients covered by government programs would cause those patients and their pharmacies to submit false claims to the government because no one told the government about the kickbacks, which all understood was prohibited by regulations covering government paid programs.

179.    A provider cannot treat patients covered by government programs unless the provider agrees to abide by the regulations, which includes a prohibition against accepting kickbacks and causing false claims to be made.

180.    Forest knew it would ultimately receive payment for the Forest Lab drugs that were illegally dispensed.

181.    Both Forest and the speakers knew Forest expected that in exchange the speakers would prescribe Forest drugs at a volume that made the payments a worthy investment on Forest's behalf and that they would not be allowed to continue as Forest speakers if they did not maintain or increase their Forest drug prescription levels.

182.    Forest Pharma sales representatives regularly discussed prescription volume with doctors based upon the weekly prescription data provided to the sales representatives by Forest Pharma.

183.    Some, but not nearly all, of the speakers involved in the conspiracy are national speakers and examples are cited in preceding paragraphs including Dr. Richard Brittingham of Oklahoma, Dr. James Woods of Tennessee,  Dr. David Kavtaradze of Georgia, and Dr. Simon Llewellyn of Louisiana. Relator is most familiar with those from Wisconsin and whose actions are described above and include Dr. Alvin F. Wells, Dr. Timothy Turbett, Dr. Emilio C. Gatti, Dr. Cheryl Tapp, Dr. Ekaterina Soforo, Dr. Jeffrey Junig, Dr. Juan Albino-Rodriguez, and Dr. Alfred Neuhoff.

**VIII. <u>FOREST PHARMACEUTICALS DISCRIMINATED AGAINST RELATOR WITH REGARD TO PAY, DISCIPLINE, TERMS AND CONDITIONS OF EMPLOYMENT AND CONSTRUCTIVE DISCHARGE BECAUSE HE ATTEMPTED TO STOP FALSE CLAIMS</u>**

184.    During the course of his employment commencing June 4, 2007 as a Pharmaceutical Sales Representative with Forest Pharmaceuticals, Relator began to feel

57

dirty about the bribes and off-label selling Forest Pharma required of him as a condition of employment and he consequently began to attempt to stop the conduct resulting in false claims submitted to the government healthcare for payment.

185. In May of 2011, Forest Lab's Compliance Department and Forest Pharmaceutical's Human Resources Department contacted Relator and required him to submit to an interview regarding a compliance letter Forest Pharmaceuticals had received from the United States Federal Drug Administration ("FDA") Office of Prescription Drug Promotion, which was then the Division of Drug Marketing, Advertising and Communication ("DDMAC"). The letter addressed a complaint by Dr. Steven J. Donatello of Glendale, Wisconsin to the effect that on May 12, 2010 a Forest Pharmaceutical Sales Representative had made off-label claims regarding the Forest Labs drug Savella.

186. The allegations in the DDMAC letter were consistent with the manner in which Relator's manager forced him and his colleagues to sell Savella to physicians--- namely for non-fibromyalgia pain, which was off-label as a use not approved by the FDA.

187. On May 11, 2011 Relator met with Brian McKenna from Human Resources and Germaine Matti of Compliance, along with two corporate attorneys, as did all of Relator's local colleagues. At that time it was circulated with a wink and a nod that employees should report they knew nothing of off-label sales. Relator complied with what he understood to be required of him and he went through the motions with the interview to report that he knew nothing. Relator expected that as a result of the DDMAC letter, Forest Pharmaceuticals and Forest Labs would cease it off-label selling which had been required of its sales force.

58

188. But on May 13, 2011, Relator and sales representatives Katie Kropp and Brad Jensen met with their manager, Jessie Edwards. He told them that nothing had changed as a result of the DDMAC letter and he directed them to continue selling Savella for "non-narcotic pain relief," an indication not approved by the FDA. Edwards directed Relator and his colleagues to take the "F" word (fibromyalgia) out of their vocabulary and instead to sell for non-narcotic pain relief generally, which was an off-label indication.

189. In the afternoon after the May 13, 2011 meeting, Relator called the Forest Compliance line and talked to Forest's Compliance Office, Germaine Matti and he reported to her that his manager had again directed his sales representatives to sell Savella off-label. Relator never heard back from the Compliance Officer.

190. During June 6 through 9, 2011 Forest Labs and Forest Pharmaceuticals had an all-company meeting in Anaheim, California for the scientific launch of Viibryd and Dalieresp. At this meeting Forest's Compliance Officer, Germaine Matti, informed Relator that she would be talking to his manager about the off-label selling of Savella.

191. On November 7, 2011 Relator had a call-in meeting with his manager, Jessie Edwards who was very angry. He required Relator to write down a script for selling Savella. Two days later on November 9, 2011, Relator again contacted corporate Compliance and sent Compliance Officer Germaine Matti a document stating that his manager again told him to use a script for Savella.

192. On November 16, 2011, Relator's manager presented him with a Mid-Year Review which was distinct from any other review he had received during his career at Forest Pharmaceuticals. First, it was pre-approved by his manager, Jessie Edwards, and the Area 5 manager, Josh Cox. Second, it was by far the worst performance review

59

Relator had ever received in his entire career with Forest Pharmaceuticals since he commenced his employment in June 2007.

193.    From November 16, 2011 forward, Forest Pharmaceuticals began a retaliatory campaign against Relator to engineer him out of a job because he had reported off-label sales violations to corporate compliance in an attempt to stop false claims being submitted to the government health plans.

194.    On November 16, 2011, Relator had another hostile and negative call-in meeting with his manager, Jessie Edwards.

195.    On February 2, 2012, Forest's corporate compliance officer, Germaine Matti and also the Human Resources Directed conducted a phone call with Relator during which Relator complained that his managers, Jessie Edwards and Josh Cox were aware that Relator had complained to compliance that he was being directed to sell Savella off-label.   Relator told them that he has worried about his job because of the adverse actions his manager had begun against him after he complained about the off-label sales directives for Savella.  Forest's corporate compliance officer told Relator not to worry.

196.    Thereafter, Relator was continuously disciplined and rated down, eliminating him from potential additional bonus compensation, which he lost.  His manager invited him to leave the company.  Specifically, on February 29, 2012 and again on March 1, 2012, Relator's manager, Jessie Edwards accompanied Relator throughout the day on his visits to various physicians.  Unlike his prior scores before he had called the compliance line and his manager was alerted, Relator received very poor "Field Trip" scores.

197.    On March 5 through 8, 2012, Relator participated in the Area 5 and Area 3 "Plan of Attack" sales meeting in Dallas, Texas.  At the meeting, Relator spoke to the

60

compliance officer, but Germaine Matti no longer offered assurance that Relator should "not worry" about his job.

198.    On March 14, 2012, Relator's manager called to inform him that he was thinking about putting Relator on a "Letter of Concern". Relator knew from his years of experience with the company, that a "Letter of Concern" meant that it was only a matter of time before the employee would be fired.

199.    On March 21, 2012, Relator again appealed to corporate compliance, Germaine Matti, and explained that he was now being subject to escalating discipline, as his manager was considering issuing him a formal "Letter of Concern", not just giving him poor performance reviews and poor "Field Trip" scores. Matti said she would bring this to the attention of the Director of Human Resources, Derrick Jackson, who would call Relator back. Relator never heard from Jackson.

200.    Although Relator had been trusting before, he began to realize that he was being retaliated against for going to compliance and his attempt to stop off-label sales of Savella. Consequently, he began to record his conversations with management.

201.    On March 23, 2012, Cox and Edwards issued a formal "Letter of Concern" to Relator. At the time, Relator was on course with all of his goals and was a very successful sales representative. He stated that the "Letter of Concern" could not thus be about his performance as Edwards said it was. Cox agreed, stating that if this was really about performance, there were at least 13 other sales representatives in his territory whose performance was lower and would have received a "Letter of Concern". Cox explained that Relator was correct, that the discipline was unrelated to Relator's actual performance, but was instead only about Relator's "attitude".

61

202.    On April 16, 2012, Relator had a call-in meeting with Josh Cox about his recent performance. During this conversation, Cox admitted that Relator's "attitude" about the company was just fine until "the last six (6) months" when Relator had supposedly shown his position, meaning that was when management learned that Relator had gone to compliance, making it more difficult for Forest to sell Savella off-label in Relator's territory.

203.    Thereafter on many occasions, Cox and Edwards recommended that Relator look for a job elsewhere because it was "not working out". They explained to him what he already knew, that the "Letter of Concern" was the first step toward forcing him out of the company.

204.    Relator suffered resulting anxiety, causing both physical and mental symptoms because of the disciplinary measures and threats to terminate his employment. The Letter of Warning coincided with the time Relator's wife was about to have their first child. Then, as a new father, Relator was extremely anxious about his job security being threatened since he was the sole support of his new family.

205.    Edwards began scheduling more "Field Trips" with Relator and Kroening had to touch base with Cox as well until November when he was informed that he would be getting a second "Letter of Concern", which would essentially mean termination. Edwards called Relator to inform him that he needed to meet him on November 23, 2012 to sign the second Letter of Concern, but Kroening had located alternative employment by that time since he was being forced out of Forest.

206.    Although the compensation in his new employment was roughly equal to that of his position with Forest Pharmaceuticals, Relator was denied the opportunity for substantial bonuses, suffering economic loss of about $25,000 annually.

62

# IX. COUNTS

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

207.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

208.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

209.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of prescriptions of Forest drugs by virtue of its corporate-wide conduct throughout the United States.

210.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

211.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

212.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

213.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

214. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim for the improper payment or approval of prescriptions of Forest drugs by virtue of its corporate-wide conduct throughout the United States.

215. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

216. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(1)(c)

217. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

218. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

219. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly conspired with providers in its Speaker Bureau to commit violations of the False Claims Act for the improper payment or approval of prescriptions of all of its drugs for which it included providers in its Speakers Bureau by virtue of its corporate-wide conduct throughout the United States.

64

220. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

221. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOUR

**Retaliatory Discrimination and Constructive Discharge in Violation of 31 U.S.C. § 3730(h)**

222. Relator re-alleges and incorporates by reference all previous paragraphs and particularly those under section VIII.

223. Defendants discharged Relator after Relator objected to the false records created by Defendant. By objecting, Relator tried to ensure compliance with the regulations and requirements and prevent the submission of a false claim.

224. Through the acts of the Defendants described above, Defendants discharged Relator because of his covered conduct opposing the submission of false claims to the Government.

225. By reason of the Defendants' conduct, Relator suffered damages and is entitled to relief including, but not limited to, reinstatement with the same seniority status Relator would have had but for the discharge, two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discharge, including litigation costs and reasonable actual attorneys' fees.

65

**Violation of Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901 by Paying Kickbacks to Providers for Prescribing Forest Drugs**

226.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

227.    This is a claim for treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. § 20-77-901.

228.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Arkansas Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and or conspired to present false or fraudulent claims for payment or approval.

229.    The Arkansas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

230.    By reason of these payments, the Arkansas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

231.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Arkansas based speakers included: **Dr. Kenneth Chan**, Jonesboro, Arkansas (Namenda); **Dr. Gary Collins**, Little Rock, Arkansas (Bystolic); **Dr. Anne R. Trussell**, Little Rock, Arkansas (Savella).

66

## COUNT SIX

**Violation of California False Claims Act, Cal. Gov't Code § 12651 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

232.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

233.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12651 *et seq.*

234.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

235.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

236.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

237.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. California based speakers included: **Dr. James E. Adams**, Vista California (VIIBRYD); **Dr. James R. Adams**, Larkspur, California (Bystolic); **Dr. Gustavo Alva**, Newport Coast, California

(VIIBRYD, Namenda);**Dr. Jeffrey Alan Applebaum**, Folsom, California (VIIBRYD, Namenda); **Dr. Andrew Blumenfeld**, Delmar, California (Savella, Namenda); **Dr. Allen David Bott**, Oakland, California (Savella, VIIBRYD); **Dr. Susan Hutchinson**, Irvine, California (Savella, VIIBRYD); **Dr. Romeo L. Isidro**, Northridge, California (VIIBRYD, Namenda); **Dr. Said I. Jacob**, Glendora, California (VIIBRYD, Namenda); **Dr. Marina Raikhel**, Lomita, California (Savella, VIIBRYD, Bystolic).

## COUNT SEVEN

**Violation of Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

238.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

239.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 *et seq.*

240.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and or conspired to present false or fraudulent claims for payment or approval.

241.     The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

242.     By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

68

243. Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Colorado based speakers included: **Dr. Erasmus G Morfe**, Littleton, Colorado (Savella); **Dr. Michael C. Saathoff**, Pueblo, Colorado (VIIBRYD, Namenda); **Dr. Zachary Shpall**, Denver, Colorado (Bystolic).

## COUNT EIGHT

### Violation of Connecticut False Claims Act, Conn. Gen. Stat. § 176-301a et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

244. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

245. This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. §176-301a *et seq.*

246. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

247. The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

248. By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

69

249. Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Connecticut based speakers included: **Dr. Peter Giacomazzi**, Prospect, Connecticut (Savella, Bystolic); **Dr. Srinath Kadimi**, Fairfield, Connecticut (Namenda); **Dr. Jeffrey Howard Katz**, Manchester, Connecticut (VIIBRYD, Bystolic); **Dr. Raymond C Kurker**, South Windsor, Connecticut (Savella, VIIBRYD); **Dr. Morris  Papernik**, Glastonbury, Connecticut (Savella, VIIBRYD).

## <u>COUNT NINE</u>

### Violation of Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

250. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

251. This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 *et seq*.

252. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

253. The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

254. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

255. Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Delaware based speakers included **Dr. Beshara Nicolas Helou**, Georgetown, Delaware (Bystolic); **Dr. Seth Ivins**, Montchanin, Delaware (Savella, Bystolic).

## COUNT TEN

**Violation of District of Columbia False Claims Act, D.C. Code § 2-308.14 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

256. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

257. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq*.

258. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

259. The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

71

260. By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

261. Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. District of Columbia based speakers included: Dr. Patricia Davidson, District of Columbia (Bystolic).

## COUNT ELEVEN

**Violation of Florida False Claims Act, Fla. Stat. Ann. § 68.081 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

262. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

263. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.

264. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

265. The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

266. By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

72

267.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Florida based speakers included: **Dr. David Billmeier**, Port Orange, Florida (Bystolic); **Dr. Sherif M. El-Salawy**, Gainesville, Florida (Namenda, Bystolic); **Dr. Miguel Flores**, Miami, Florida (VIIBRYD, Namenda); **Dr. Gregg L. Friedman**, Hallandale Beach, Florida (VIIBRYD, Namenda); **Dr. Jeffrey Gelblum**, Miami, Florida (Savella, VIIBRYD, Namenda); **Dr. Kuncheria Joseph**, Venice, Florida (Bystolic); **Dr. Lance Kim**, Ocala, Florida (Savella, Namenda); **Dr. Ramon O. Martinez, Orlando**, Florida (VIIBRYD, Namenda); **Dr. Walter C. Martinez**, West Palm Beach, Florida (VIIBRYD, Namenda); **Dr. Thomas A. Michelsen**, Jacksonville, Florida (Bystolic); **Dr. Nilesh Kumar Patel**, Bradenton, Florida (Savella); **Dr. Venugopal A. Reddy**, Beverly Hills, Florida (Namenda); **Dr. Cres A. Rodriguez**, Tampa, Florida (Bystolic).

## <u>COUNT TWELVE</u>

**Violation of Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

268.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

269.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 *et seq.*

270.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to

73

be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

271. The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

272. By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

273. Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Georgia based speakers included: **Dr. David Kavtaradze**, Cordele, Georgia (Namenda, Bystolic); **Dr. Brian Nadolne**, Marietta, Georgia (Bystolic).

## COUNT THIRTEEN

### Violation of Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

274. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

275. This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq*.

276. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to

74

be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

277.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

278.    By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

279.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Hawaii based speakers included: **Dr. Joy H. Higa**, Kaneohe, Hawaii (Namenda); **Dr. Ronald G. Perry**, Honolulu, Hawaii (Savella, Bystolic); **Dr. Keith K Woo**, Honolulu, Hawaii (Savella, Namenda).


## COUNT FOURTEEN

**Violation of Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

280.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

281.    This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq*.

282.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to

Case 2:12-cv-00366-WED   Filed 02/05/16   Page 75 of 97   Document 67

be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

283.   The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

284.   By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

285.   Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Illinois based speakers included: **Dr. Thomas Bartuska**, Orland Park, Illinois (VIIBRYD, Namenda); **Dr. Ira Fenton**, Vernon Hills, Illinois (Savella, Bystolic); **Dr. William J. Giakas**, Rockford, Illinois (VIIBRYD, Namenda); **Dr. Sudhir M. Gokhale**, Oaklawn, Illinois (VIIBRYD, Namenda); **Dr. Scott Gordon**, Evanston, Illinois (VIIBRYD, Namenda); **Dr. Christopher R. Green**, Alton, Illinois (Bystolic); **Dr. Lori Marie Guyton**, Herrin, Illinois (Savella, Namenda); **Dr. Jay Joshi**, Deer Park, Illinois (Savella); **Dr. Sanjeev V. Joshi**, Chicago Heights, Illinois (Bystolic); **Dr. James A. Lengemann**, Aurora, Illinois (VIIBRYD, Bystolic); **Dr. Morgan Paul Meyer**, Lombard, Illinois (Namenda, Bystolic); **Dr. Morris Papernik**, Skokie, Illinois (VIIBRYD, Savella); **Dr. Jeffrey S. Royce**, Rockford, Illinois (Savella, Bystolic); **Dr. Geoffrey Shaw**, Northfield, Illinois (VIIBRYD); **Dr. Hilliard E. Slavick**, Chicago, Illinois (Savella, Namenda); **Dr. Philip Van Reken**, Lombard, Illinois (Bystolic); **Dr. Joy Webster**, Alton, Illinois (VIIBRYD,

76

Namenda); **Dr. Alvin F. Wells**, Grayslake, Illinois (Savella); **Dr. Jong-Yoon Yi**, Joliet, Illinois (Bystolic).

<u>**COUNT FIFTEEN**</u>

**Violation of Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5 by Paying Kickbacks to Providers for Prescribing Forest Drugs**

286.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

287.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

288.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

289.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

290.    By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

291.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Indiana based speakers included: **Dr. Louis J Calli**, Bloomington, Indiana (Bystolic); **Dr. Steven D.**

77

**Maynard**, Terre Haute, Indiana (Savella, Namenda); **Dr. Suhayl J. Nasr**, Michigan City, Indiana (VIIBRYD, Namenda); **Dr. Anthony Charles Simchak**, Indianapolis, Indiana (Savella, Namenda); **Dr. Christopher Michael Wilson**, Indianapolis, Indiana (Savella, Namenda).

<u>**COUNT SIXTEEN**</u>

**Violation of Iowa Medicaid False Claims Act, Iowa Code § 685.1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

292.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

293.     This is a claim for treble damages and civil penalties under the Iowa Medicaid False Claims Act, Iowa Code § 685.1 *et seq.*

294.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

295.     The Iowa Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

296.     By reason of these payments, the Iowa Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

297.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included

78

information about programs paying for the prescriptions. Iowa based speakers included: **Dr. Donal D. Hill**, Fairfield, Iowa (Namenda, Bystolic); **Dr. David Schweizer**, Charles City, Iowa (Savella, Bystolic); **Dr. Fadi Yacoub**, Cedar Rapids, Iowa (Bystolic).

## COUNT SEVENTEEN

**Violation of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:439.1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

298.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

299.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq*.

300.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

301.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

302.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

303.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Louisiana based speakers

79

included: **Dr. Maria B. Cruse**, Thibodaux, Louisiana (VIIBRYD, Namenda); D**r. Paul Matthew Dammers**, Baton Rouge, Louisiana (VIIBRYD, Namenda); D**r. Kirit S. Patel**, Shreveport, Louisiana (Bystolic); **Dr. Llewellyn L. Simon**, Monroe, Louisiana (Bystolic).

## COUNT EIGHTEEN

**Violation of Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O) by Paying Kickbacks to Providers for Prescribing Forest Drugs**

304.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

305.     This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O).

306.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

307.     The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

308.     By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

309.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which

80

included information about programs paying for the prescriptions. Massachusetts based speakers included: **Dr. Andrew Mooring Aldridge**, Medford, Massachusetts (VIIBRYD, Namenda); **Dr. Max G Baranovsky**, Chestnut Hill, Massachusetts (VIIBRYD, Namenda); **Dr. Stephen L. Chabot**, Walpole, Massachusetts (VIIBRYD, Namenda); **Dr. David F. McMahon**, Danvers, Massachusetts (VIIBRYD, Namenda).

<u>**COUNT NINETEEN**</u>

**Violation of Michigan Medicaid False Claim Act, MCLA § 400.601 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

310.  Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

311.  This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq.*

312.  By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

313.  The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

314.  By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

81

315. Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Michigan based speakers included: **Dr. Noor S. Bunney**, Troy, Michigan (Savella, Bystolic); **Dr. J. Blake Casher**, Okemos, Michigan (VIIBRYD, Namenda); **Dr. Curtis P. Craig**, Rochester, Michigan (Savella, Bystolic); **Dr. Jeffrey Deitch W. Bloomfield**, Michigan, (Bystolic); **Dr. Michael Francis Engel**, Traverse City Michigan, (VIIBRYD, Namenda); **Dr. Michael Haroutunian**, Taylor, Michigan (VIIBRYD, Bystolic); **Dr. Steven Katzman**, Livonia, Michigan (VIIBRYD, Namenda, Bystolic); **Dr. Viorel Lupu**, Taylor, Michigan (Savella, Bystolic); **Dr. Henry P. Mendoza**, Flint, Michigan (Savella Bystolic); **Dr. Majid Qazi**, Farmington Hills, Michigan (Bystolic); **Dr. Manzar Y. Rajput**, Ypsilanti, Michigan (VIIBRYD, Namenda); **Dr. David D. Sova**, Grand Rapids, Michigan (Savella Bystolic); **Dr. Nael M. Tarakji**, Flint, Michigan (VIIBRYD, Savella).

## <u>COUNT TWENTY</u>

**Violation of Minnesota False Claims Act, Minn. Stat. § 15c.01 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

316. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

317. This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15c.01 *et seq.*

318. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to

82

be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

319.     The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

320.     By reason of these payments, the Minnesota Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

321.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Minnesota based speakers included: **Dr. Todd M. Hess**, Minneapolis, Minnesota (Savella); **Dr. Christa K. Hoiland, Lindstrom**, Minnesota (Namenda, Bystolic); **Dr. Kassamali Jamal**, Virginia, Minnesota (Bystolic); **Dr. Robert John Olson**, Mankato, Minnesota (VIIBRYD, Namenda).

## COUNT TWENTY-ONE

**Violation of Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

322.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

323.     This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

324.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or

83

approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

325.     The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

326.     By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

327.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Montana based speakers included: **Dr. Newton B. Cou**tinho, Missoula, Montana (Bystolic); **Dr. Sherry A. Reid**, Missoula, Montana (Namenda).

### COUNT TWENTY-TWO

**Violation of Nevada False Claims Act, Nev. Rev. Stat. §357.010 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

328.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

329.     This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq*.

330.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to

84

be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

331.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

332.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

333.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Nevada based speakers included: **James Edward Mock**, Las Vegas, Nevada (Bystolic); **Dr. Upinder Singh**, Las Vegas, Nevada (Namenda); **Dr. Dodge A. Slagle**, Henderson, Nevada (VIIBRYD, Savella).

## **COUNT TWENTY-THREE**

**Violation of New Jersey False Claims Act, N.J. Rev. Stat. Ann. § 2A:32c-1, et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

334.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

335.    This is a claim for treble damages and civil penalties under the New Jersey Medicaid Fraud and False Claims Law, N.J. Rev. Stat. Ann. § 2A:32c-1, *et seq*.

336.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or

85

approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

337.    The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

338.    By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.


## COUNT TWENTY-FOUR

**Violation of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978, § 27-14-1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

339.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

340.    This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. 1978 § 27-14-1 *et seq*.

341.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

342.    The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

86

343.    By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

344.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. New Mexico based speakers included: **Dr. Jayant Kumar**, Albequerque, New Mexico (Bystolic).

## COUNT TWENTY-FIVE

### Violation of New York False Claims Act, N.Y. State Fin. Law § 187 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

345.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

346.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*

347.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

348.    The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

349.    By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

350.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. New York based speakers included: **Dr. George S. Alexopoulos**, White Plains, New York (VIIBRYD, Namenda); **Dr. Casilda Balmaceda**, New York, New York (Savella, Namenda); **Dr. Yanina Belotserkovskaya**, Brooklyn, New York (Namenda, Bystolic); **Dr. Yadagiri Chepuru**, Yonkers, New York (VIIBRYD, Namenda); **Dr. Bradley Cohen**, Mineola, New York (Savella, Namenda); **Dr. Edward Fruitman**, Atlantic Beach, New York (VIIBRYD, Namenda); **Dr. Jose Goris**, New York, New York (Bystolic); **Dr. Luis E. Guerrero**, Bronx, New York (Bystolic); **Dr. Sanjay Gupta**, Williamsville, New York (VIIBRYD, Namenda); **Dr. Eugene J. Kalmuk**, Cheektowaga, New York (VIIBRYD, Bystolic); **Dr. Sima Muster**, Brooklyn, New York (Namenda, VIIBRYD, Bystolic); **Dr. James North**, Greenfld Ctr, New York (Savella, Bystolic); **Dr. Sanjiv Patel**, Binghamton, New York (Savella, VIIBRYD, Bystolic); **Dr. Xavier San Miguel**, Jackson Heights, New York (VIIBRYD, Namenda); **Dr. Kenneth Schwartz**, Saratoga Springs, New York (VIIBRYD, Bystolic); **Dr. Zia M. Sheikh**, Olean, New York (Bystolic); **Dr. Raul Vazquez**, Buffalo, New York (Savella, Bystolic); **Dr. Gene Zitser**, Brooklyn, New York (Savella, Namenda).

## COUNT TWENTY-SIX

**Violation of North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

351.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

352.     This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq*.

353.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

354.     The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

355.     By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

356.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. North Carolina based speakers included: **Dr. Richard A. Aronson**, Greensboro, North Carolina (Savella, Namenda, Bystolic); **Dr. Keung Lee**, Asheboro, North Carolina (Bystolic); **Dr. Sydney G. Short**, Lumberton, North Carolina (Bystolic); **Dr. Hemant Solomon**, Greensboro, North Carolina (Bystolic); **Dr. Robert Yapundich**, Hickory North, Carolina (Savella, Namenda).

## COUNT TWENTY-SEVEN

### Violation of Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

357.　Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

358.　This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63§ 5053 *et seq*.

359.　By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

360.　The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

361.　By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

362.　Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Oklahoma based speakers included: **Dr. Richard T. Brittingham**, Lawton, Oklahoma (Savella, Namenda, VIIBRYD, Bystolic); **Dr. Andrea Fraley**, Oklahoma City, Oklahoma (Savella); **Dr. Amal E. Moorad**, Oklahoma City, Oklahoma (VIIBRYD, Savella).

90

## COUNT TWENTY-EIGHT

### Violation of Rhode Island State False Claims Act, R.I. Gen. Law § 9-1.1-1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

363.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

364.    This is a claim for treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Law § 9-1.1-1 *et seq.*

365.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

366.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

367.    By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY-NINE

### Violation of Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs

368.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

369.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act§ 71-5-181 *et seq.*

91

370.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

371.     The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

372.     By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

373.     Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Tennessee based speakers included: **Dr. Darrell G Arnett**, Franklin, Tennessee (Savella); **Dr. Jon Winston** Draud, Nashville, Tennessee (VIIBRYD, Savella); **Dr. Richard W. Garman**, Nashville, Tennessee (Namenda, Bystolic); **Dr. John Vincent Golding, III**, Chattanooga, Tennessee (Bystolic); **Dr. Dharmesh Patel**, Memphis, Tennessee (Bystolic); **Dr. James R. Woods**, Memphis, Tennessee (VIIBRYD, Savella); **Dr. Robert Woods**, Lebanon, Tennessee (Bystolic).

## COUNT THIRTY

**Violation of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

374.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

375.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

376.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

377.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

378.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

379.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Texas based speakers included: **Dr. David W. Crumpacker**, Plano, Texas (VIIBRYD, Namenda); **Dr. Waymon Drummond**, Dallas, Texas (Bystolic); **Dr. Robert Jacob Hernandez**, Sherman, Texas (Savella, Bystolic); **Dr. Jose E. Igoa**, McAllen, Texas (VIIBRYD, Namenda); **Dr. Rakesh Jain**, Lake Jackson, Texas (VIIBRYD,

93

Savella); **Dr. Vikram Mehra**, Wharton, Texas (VIIBRYD, Namenda); **Dr. Henry A. Punzi**, Carrolton, Texas (Bystolic).

## COUNT THIRTY-ONE

**Violation of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. by Paying Kickbacks to Providers for Prescribing Forest Drugs**

380.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

381.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq*.

382.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

383.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

384.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

385.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included information about programs paying for the prescriptions. Virginia based speakers included: **Dr. Juan Aponte**, Forest, Virginia (Savella, Bystolic); D**r. Bruce C.**

94

**Higinbothom**, Abingdon, Virginia (VIIBRYD, Savella, Bystolic); **Dr. Mariano Piedra**, Richmond, Virginia (VIIBRYD, Namenda); **Dr. David J. Scheiderer**, Roanoke, Virginia (VIIBRYD, Namenda); **Dr. William Yetter**, Virginia Beach, Virginia (VIIBRYD, Namenda).

## COUNT THIRTY-TWO

**Violation of Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931 by Paying Kickbacks to Providers for Prescribing Forest Drugs**

386.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

387.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931.

388.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

389.    The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

390.    By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

391.    Forest provided its Sales Force with names of provider speakers and their prescribing history was provided to the Sales Force in their states, which included

95

information about programs paying for the prescriptions. Wisconsin based speakers included: **Dr. Juan Albino-Rodriguez**, Neenah, Wisconsin (Savella); **Dr. Joseph J. Burgarino**, Milwaukee, Wisconsin (VIIBRYD, Namenda); **Dr. Emilio C. Gatti**, Oshkosh, Wisconsin (Savella); **Dr. Suzanne Beth Grimm**, Sheboygan, Wisconsin (VIIBRYD, Namenda); **Dr. Jeffrey Junig**, Fond du Lac, Wisconsin (VIIBRYD); **Dr. Ammar Kafa**, Whitehall, Wisconsin (Savella, Bystolic); **Dr. Alfred Neuhoff**, Stevens Point, Wisconsin (Bystolic); **Dr. Ekaterina V. Soforo**, Mequon, Wisconsin (Savella); **Dr. Cheryl R. Tapp**, Fond Du Lac, Wisconsin (Namenda); **Dr. Timothy Turbett**, Wausau, Wisconsin (Bystolic); **Dr. Alvin Wells,** Franklin, Wisconsin (Savella) **Dr. Thomas R. Wallhaus**, Madison, Wisconsin (Bystolic); **Dr. James B. Winston**, Milwaukee, Wisconsin (VIIBRYD); **Dr. Jay B. Winston**, Milwaukee, Wisconsin (VIIBRYD).


## X.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

    (i)     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the State False Claims Acts;

    (ii)    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States under similar provisions of the State False Claims Acts;

96

(iii)    Relator be awarded the maximum "relator's share" allowed pursuant to
31 U.S.C. § 3730(d) and similar provisions of the State False Claims
Acts;

(iv)    Relator be awarded all costs of this action, including attorneys' fees
and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the
State False Claims Acts;

(vi)    Defendants be enjoined from concealing, removing, encumbering or
disposing of assets which may be required to pay the civil monetary
penalties imposed by the Court;

(vii)   Defendants disgorge all sums by which they have been enriched unjustly
by their wrongful conduct; and

(viii)  The United States, the States, and Relators recover such other relief as the
Court deems just and proper.

**Dated at Milwaukee, Wisconsin this 5th day of February, 2016.**

By: s/Mary C. Flanner

Nola J. Hitchcock Cross
WI SBN 1015817
Mary C. Flanner
WI SBN 1013095
Attorneys for Plaintiff/Relator
Cross Law Firm, S.C.
845 North 11th Street
Milwaukee, WI 53233
Telephone (414) 224-0000
Fax (414) 273-7055
njhcross@crosslawfirm.com
mflanner@crosslawfirm.com

97